**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DISTRICT**

| | |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS, | |
| Plaintiff, | Case No. 2:23-cv-02096-MHW-KAJ |
| v. | Judge |
| DAVE YOST, *Ohio Attorney General*; and JENIFER FRENCH, DANIEL R. CONWAY, DENNIS P. DETERS, LAWRENCE K. FRIEDEMAN, and JOHN D. WILLIAMS, *Commissioners of the Ohio Public Utilities Commission*, in their official capacities, | Magistrate Judge |
| Defendants. | **ANSWER TO THE COMPLAINT, AND AFFIRMATIVE DEFENSES, SUBMITTED ON BEHALF OF DEFENDANT COMMISSIONERS OF THE PUBLIC UTILITIES COMMISSION OF OHIO** |

Defendants Jenifer French, Daniel R. Conway, Dennis P. Deters, Lawrence K. Friedeman, and John D. Williams, Commissioners of the Ohio Public Utilities Commission in their official capacities ("Commissioners") answer as follows:

1. Congress has exercised broad regulatory authority over rail transportation for well over a century. During that time, Congress and federal regulatory agencies, including the Federal Railroad Administration ("FRA") and the Surface Transportation Board ("STB"), have allowed railroads to set minimum crew sizes through collective bargaining, rather than imposing such requirements by law.

**ANSWER:   Defendants admit that Congress has exercised regulatory authority over rail transportation in the past. Defendants lack knowledge or information**

**sufficient to form a belief about the truth of the remaining allegations in Paragraph 1.**

2.      Congress has expressly prohibited Ohio from establishing a minimum crew size. In 1973, Congress enacted the Regional Rail Reorganization Act ("3R Act") to address a railway crisis in the Northeast and Midwest. "The 3R Act was designed to reorganize the railroads in those regions, bringing them under the control of a new government corporation [Conrail] that would create a plan to turn them into an economically viable railway system." *Ind. R.R. Co. v. Ill. Com. Comm'n*, 576 F. Supp. 3d 571, 575 (N.D. Ill. 2021).

**ANSWER:   Defendants admit that Congress enacted the Regional Rail Reorganization Act ("3R Act") in 1973 to address a railway crisis. Defendants deny the remaining allegations in Paragraph 2.**

3.      In the Northeast Rail Service Act of 1981, Congress amended Section 711 of the 3R Act to include an express preemption clause. As amended, Section 711 of the 3R Act provides that: No State may adopt or continue in force any law, rule, regulation, order, or standard requiring the Corporation [Conrail] to employ any specified number of persons to perform any particular task, function, or operation, or requiring the Corporation to pay protective benefits to employees, and *no State in the Region may adopt or continue in force any such law, rule, regulation, order, or standard with respect to any railroad in the Region*. 45 U.S.C. § 797j (emphasis added).

**ANSWER:** **Defendants admit that in the Northeast Rail Service Act of 1981, Congress amended Section 711 of the 3R Act. Defendants deny the remaining allegations in Paragraph 3.**

4. Ohio is a "State in the Region," as defined by Section 102 of the 3R Act, *see* 45 U.S.C. § 702(17), (19).

**ANSWER:** **Defendants admit the allegations in Paragraph 4.**

5. The plain text of the 3R Act thus prohibits Ohio from adopting any law requiring any railroad in the State to employ any specified number of persons to perform any particular task, function, or operation.

**ANSWER:** **Defendants deny the allegations in Paragraph 5.**

6. Nonetheless, in March 2023, Ohio enacted Ohio Rev. Code § 4999.09 (effective June 30, 2023) (the "Crew Size Law"), which requires that all freight railroads operate in almost all circumstances with at least two crew members.

**ANSWER:** **Defendants admit that Ohio enacted Ohio Rev. Code § 4999.09 and that that law became effective June 30, 2023. Defendants deny the remaining allegations in Paragraph 6.**

7. The Crew Size Law mandates that "[a] train or light engine used in connection with the movement of freight shall have a crew that consists of at least two individuals." Ohio Rev. Code § 4999.09(B). It provides exceptions only for "hostler service or utility employees." *Id.* When the Crew Size Law takes effect on June 30, 2023, Defendants Jenifer French (Chair), Daniel R. Conway, Dennis P. Deters, Lawrence K. Friedeman, and John Williams, as Commissioners of the Ohio Public Utilities

Commission, will have power to enforce the Crew Size Law by imposing civil penalties, which Defendant Dave Yost, as the Ohio Attorney General, will have the power to collect. *Id.* § 4999.09(C).

**ANSWER:** **Defendants admit that Paragraph 7 contains partial quotations from Ohio Rev. Code § 4999.09(B), and further admit that the requirements set forth in division (B) of that section are solely related to safety, including ensuring that no train or light engine used in connection with the movement of freight in this state is left without a functional crew person as a result of a medical emergency. Defendants further admit that, as used in division (B) of this section, "train or light engine used in connection with the movement of freight" does not include hostler service or utility employees. Defendants further admit that the Attorney General, upon the request of the Public Utilities Commission, may bring a civil action to collect the penalties described in Ohio Rev. Code § 4999.09(C). Defendants deny the remaining allegations in Paragraph 7 and deny that the Commissioners are properly named as defendants in this lawsuit.**

8.     "The [3R] Act defined a region that includes [Ohio], and set out certain restrictions on how states in that region can regulate railroads. [Ohio] must abide by those restrictions, and in passing the Crew Size Law, it failed to do so." *Ind. R.R. Co.*, 576 F. Supp. 3d at 577; *see also id.* at 576 ("[Ohio] wants to mandate a crew size of two to perform the task, function or operation of moving freight with a train or light engine; this is exactly what the 3R Act prohibits."). As a result, the 3R Act preempts the Crew Size Law.

**ANSWER:   Defendants deny the allegations in Paragraph 8.**

9.     Alternatively, the Crew Size Law is preempted by the ICC Termination Act ("ICCTA"), 49 U.S.C. § 10501(b), which grants exclusive authority to the STB to regulate matters falling within its broad scope.

**ANSWER:   Defendants deny the allegations in Paragraph 9.**

10.    The Crew Size Law is also preempted in part by the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20106.

**ANSWER:   Defendants deny the allegations in Paragraph 10.**

11.    FRA has carefully considered the need for multi-person crews for two specific types of operations: (1) "helper service," or using a locomotive to assist another train that has incurred mechanical failure or lacks the power to traverse difficult terrain; and (2) "remote control operations," or using a radio transmitter and receiver system to operate a locomotive by a person not physically located at the controls in the locomotive cab.

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 11.**

12.    With respect to each, FRA has determined that no minimum crew-size regulation is necessary or appropriate. *See BNSF Ry. Co. v. Doyle*, 186 F.3d 790, 801-02 (7th Cir. 1999) (helper service); FRA, *Denial of BLET Petition on RCO and Other Single-Person Operations* (Nov. 10, 2009) (remote control operations).

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 12.**

13.     Under FRSA, FRA's determination that no such regulation is appropriate preempts any state law purporting to establish such a requirement. *See*, *e.g.*, *Norfolk & W. Ry. Co. v. Pub. Utils. Comm'n of Ohio*, 926 F.2d 567, 570 (6th Cir. 1991). Accordingly, to the extent that the Crew Size Law requires two-person crews for helper service or remote control operations, it is preempted.

**ANSWER:**     **Defendants deny the allegations in Paragraph 13.**

14.     Plaintiff seeks a declaration that the Crew Size Law is preempted in full or in part.

**ANSWER:     Paragraph 14 requests legal relief to which no answer is required. To the extent an answer is required, Defendants deny that Oho Rev. Code § 4999.09 is preempted by federal law.**

15.     Plaintiff also seeks an injunction preventing Defendants from enforcing the Crew Size Law. As explained below, the Crew Size Law cannot be squared with these federal laws or with Congress' extensive control over railroad operations. If not enjoined, the Crew Size Law would subject Plaintiff's members to immediate and threatened injury, because they would be put to the untenable choice of defying the Crew Size Law and subjecting themselves to civil penalties or complying with the Law and giving up their right under federal law to operate safely and efficiently, unencumbered by minimum-crew-size requirements.

**ANSWER:**     **Defendants deny the allegations in Paragraph 15.**

16.     Plaintiff Association of American Railroads is a nonprofit trade association whose members include all of the Class I freight railroads (North America's largest

freight railroads), smaller freight railroads, and passenger and commuter railroads. AAR's members operate approximately 83 percent of the line-haul mileage, employ 95 percent of the workers, and account for 97 percent of the freight revenues of all railroads in the United States. AAR and its members are committed to operating the safest, most efficient, cost-effective, and environmentally sound freight rail transportation system in the world. AAR represents its member railroads in proceedings before Congress, administrative agencies, and the courts in matters of common interest, such as the issues involved in this lawsuit. AAR members, including Canadian National Railway, CSX Transportation, and Norfolk Southern Railway, operate in Ohio. CSX Transportation and Norfolk Southern Railway use one-person crews in Ohio for certain yard operations, including remote control switching operations.

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 16.**

17.     Defendant Dave Yost is the Ohio Attorney General. As of June 30, 2023, the Attorney General will have authority, "upon the request of the public utilities commission," to "bring a civil action to collect" civil penalties assessed under the Crew Size Law. Ohio Rev. Code § 4999.09(C)(2).

**ANSWER:   Defendants admit that defendant Dave Yost is the Ohio Attorney General. Defendants admit that Paragraph 17 contains partial quotations from Ohio Rev. Code § 4999.09.**

18.     Defendant Jenifer French is the Chair, and Defendants Daniel R. Conway, Dennis P. Deters, Lawrence K. Friedeman, and John Williams are Commissioners, of the

Ohio Public Utilities Commission ("Commission"). Those individuals were appointed by the Governor and confirmed by the Ohio Senate for five-year terms. As of June 30, 2023, the Commission will have authority to "assess a civil penalty against a person who willfully violates" the Crew Size Law. Ohio Rev. Code § 4999.09(C)(1).

**ANSWER:   Defendants admit that Jenifer French is the Chair, and Defendants Daniel R. Conway, Dennis P. Deters, Lawrence K. Friedeman, and John Williams are Commissioners of the Public Utilities Commission of Ohio, and that those individuals were appointed by the Governor and confirmed by the Ohio State Senate for five-year terms. Defendants further admit that Paragraph 18 contains a partial quotation from Ohio Rev. Code § 4999.09. Defendants deny that the Commissioners can be named as defendants in this matter.**

19.    This Court has jurisdiction under 28 U.S.C. § 1331 because the case arises under (i) the Supremacy Clause of the Constitution of the United States, Article VI, clause 2; and (ii) the laws of the United States, including the 3R Act, ICCTA, and FRSA.

**ANSWER:   Defendants admit that the Court has jurisdiction over proper lawsuits brought under the Supremacy Clause of the Constitution of the United States, Article VI, clause 2, and that Plaintiffs purport to bring their claims under the Supremacy Clause and other laws of the United States, including FRSA, the 3R Act, and ICCTA.**

20.    This Court may declare the legal rights and obligations of the parties in this action under 28 U.S.C. § 2201 because this action presents an actual controversy within the Court's jurisdiction.

**ANSWER:   Defendants admit that Plaintiffs purport to bring this action under 28 U.S.C. § 2201.**

21.     Venue is proper in this district under 28 U.S.C. § 1391(b).

**ANSWER:   Defendants admit that venue is proper in this district.**

22.     AAR has associational standing to bring this suit on behalf of its members because at least one of those members, including Canadian National Railway, CSX Transportation, and Norfolk Southern Railway, will be directly, adversely, and imminently affected by the Crew Size Law and thus would have standing to sue in its own right. If Defendants are not enjoined, AAR's members face the "immediate or threatened injury" of enforcement actions. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977). Furthermore, the interests that AAR seeks to protect by way of this lawsuit are germane to the organization's purpose. Finally, neither the claims asserted nor the relief requested requires an individual member of AAR to participate in this suit.

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 22.**

23.     "[T]echnology has enabled a gradual reduction in the number of train crewmembers from about five in the 1960s to about two by the end of the 1990s." FRA, *Train Crew Size Safety Requirements*, 87 Fed. Reg. 45,564, 45,567 (July 28, 2022) (notice of proposed rulemaking). Among the "major technological breakthroughs" that enabled reduced crew sizes were the advent of diesel locomotives, which eliminated the

need for firemen, and "end-of-train device[s]," which removed the need for a caboose and "one or more crewmembers to be at the rear of a train." *Id.*

**ANSWER:** **Defendants admit that Paragraph 23 contains partial quotations from** ***Train Crew Staffing*****, 81 Fed. Reg. 13,918, 13,937 (Mar. 15, 2016) (notice of proposed rulemaking). Defendants lack knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 23.**

24. For decades, freight railroads have used one-person crews safely in a variety of contexts, both in the United States and in other countries.

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 24.**

25. Railroads in the United States have safely used one-person crews in a wide variety of operating contexts for many years. For example, as "remotely controlled locomotive operations" have become widespread over the last 25 years, "utilizing only a one-person crew for switching service ha[s] become commonplace." 87 Fed. Reg. at 45,567. In 2016, FRA acknowledged not only that existing one-person operations "have not yet raised serious safety concerns," FRA, *Train Crew Staffing*, 81 Fed. Reg. 13,918, 13,950 (Mar. 15, 2016), but also that "it is possible that one-person crews have *contributed* to the [industry's] improving safety record," *id.* at 13,932 (emphasis added).

**ANSWER:** **Defendants admit that Paragraph 25 contains partial quotations from** ***Train Crew Staffing*****, 81 Fed. Reg. 13,918 at 13,950, 13,932 (Mar. 15, 2016) (notice of proposed rulemaking) and** ***Train Crew Size Safety Requirements,*** **87 Fed. Reg. 45,564 (July 28, 2022) (notice of proposed rulemaking). Defendants lack knowledge and**

10

**information sufficient to form a belief about the truth of the remaining allegations in Paragraph 25.**

26.     An expert study by Oliver Wyman concluded, based on accident data, that single- person train crew operations are just as safe as multiple-person operations. *See* Oliver Wyman, *Analysis of North American Freight Rail Single-Person Crews: Safety and Economics* (Feb. 3, 2015), AAR Comments Ex. 3, FRA Docket No. FRA-2021-0032. The study compared aggregate statistics on relevant equipment incidents and casualty incidents for 2007 through 2013 for operators using single-person crews versus operators using multiple-person crews. As to equipment incidents, the study found that "[w]hile the data may not conclusively support a claim that single-person crew operations are safer than multiple-person crew operations (given the possible existence of other influencing factors), it does appear that single-person crew operations are at least as safe as multiple-person crew operations." *Id.* at 24. As to casualty incidents, the study likewise found that "those rail operators using single-person crews are at least as safe as their counterparts relying on multiple-person crew[s] to operate their trains." *Id.* at 26.

**ANSWER:   Defendants admit that Paragraph 30 contains partial quotations from *Analysis of North American Freight Rail Single-Person Crews Safety and Economics* (Feb. 2015). Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 26.**

27.     A related study conducted by the consulting firm ICF International forecast accident rates for one- and two-person crews once positive train control ("PTC") was

fully implemented. *See* ICF Int'l, *Evaluation of Single Crew Risks* (Jan. 26, 2015), AAR Comments Ex. 6, FRA Docket No. FRA-2021-0032. That study found virtually no difference in accident rates between one- and two-person operations. *See id.* at 1. In fact, "[t]rain accidents due to rollaways decrease by a factor of 10 with the removal of a second person from the cab due to fewer potential situations and additional care taken when the sole operator leaves the cab." *Id.* at 5.

**ANSWER: Defendants admit that Paragraph 27 contains a partial quotation from *Evaluation of Single Crew Risks* (Jan. 26, 2015). Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 27.**

28.     Moreover, although the largest, Class I railroads typically do not use one-person crews for mainline operations, many short line railroads in the United States operate with one- person crews. Indeed, one such short line—Indiana Railroad Company ("INRD"), which is a 250-mile regional railroad operating in Indiana and Illinois—was highlighted by FRA as having safe operations. 87 Fed. Reg. at 45,568. Since 1997, it has been safely and effectively operating with one-person crews. In 2021, INRD utilized one-person crew operations on about 31 train starts per week. The implementation of one-person crew operations at INRD was the result of research, innovation, and the use of new technology. Swindall Statement (Dec. 8, 2022), AAR Comments Ex. 8, FRA Docket No. FRA-2021-0032.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 28.**

29.     INRD's evidence and data—collected over more than two decades—establishes that one-person crews are just as safe as two-person crews. INRD has had only one FRA- reportable human factor incident involving a one-person crew in 25 years of one-person operations. Of the non-FRA-reportable human factor incidents, while one-person crew operations were 18.3% of INRD man-hours from 2006 through July 2022, they only accounted for 5.9% of human factor incidents. In comparison, two-person crews were 81.7% of INRD man-hours, but accounted for 94.1% of human factor incidents. Swindall Statement, at 5-6.

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 29.**

30.     One-person crews are also commonly and safely used in other nations. *See* 81 Fed. Reg. at 13,932 (concluding that the "evidence … indicates that the safety records of these foreign operations are acceptable"). In fact, there is an extensive body of safety data documenting the performance of one-person crews in Europe. In the United Kingdom, for example, where one-person freight operations are common, the Rail Safety and Standards Board found that "one-person crews were at least as safe as multiple crew operations." Regulatory Impact Analysis, Train Crew Staffing—Notice of Proposed Rule Making, U.S. Dep't of Transp. 21 (Feb. 18, 2016).

**ANSWER:   Defendants admit that Paragraph 30 contains partial quotations from *Train Crew Staffing*, 81 Fed. Reg. 13,918, 13,932 (Mar. 15, 2016) (notice of proposed rulemaking). Defendants lack knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 30.**

31.     Oliver Wyman recently conducted a study analyzing the European data to compare the safety performance of one-person crews versus two-person crews. *See* Oliver Wyman, *Crew-Related Safety and Characteristic Comparison of European and US Railways* (Apr. 5, 2021), AAR Comments Ex. 2, FRA Docket No. FRA-2021-0032. The study reviewed 2006-2019 accident reporting data for 28 railroads in Europe (where 95 percent of rail traffic is moved by one-person crews) and for the U.S. Class I railroads. Oliver Wyman "found no evidence that railroads operating with two-person crews are statistically safer than railroads operating with one-person crews." *Id*. at 3. More generally, the study "found no significant differences in safety statistics based on crew size." *Id*.

**ANSWER:**   **Defendants admit that Paragraph 31 contains partial quotations from** *Crew-Related Safety and Characteristic Comparison of European and US Railways* **(Apr. 5, 2021). Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 31.**

32.     In Ohio, AAR's members have used one-person crews for remote control operations safely for many years.

**ANSWER:**   **Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 32.**

33.     Congress passed the 3R Act in 1974 to address a railway crisis in the Northeast and Midwest.

**ANSWER:**   **Defendants admit the allegations in Paragraph 33.**

34.     The 3R Act was designed to reorganize the railroads in those regions, bringing them under the control of a new government corporation—Conrail—that would create a plan to turn them into an "economically viable [railway] system." *Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 109-17 (1974); 45 U.S.C. § 701(b)(2).

**ANSWER:     Defendants admit the allegations in Paragraph 34.**

35.     The 3R Act includes prescriptions specific to the region most affected by the railway crisis the Act sought to remedy. That "Region" was defined to include 17 states, including Ohio, as well as the District of Columbia and some "portions of contiguous States." 45 U.S.C. § 702(17).

**ANSWER:     Defendants admit the allegations in Paragraph 35.**

36.     One of those prescriptions is an express preemption clause against crew-size requirements: No State may adopt or continue in force any law, rule, regulation, order, or standard requiring the Corporation [Conrail] to employ any specified number of persons to perform any particular task, function, or operation, ... and *no State in the Region may adopt or continue in force any such law, rule, regulation, order, or standard with respect to any railroad in the Region*. 45 U.S.C. § 797j (emphasis added).

**ANSWER:     Defendants admit that Paragraph 36 contains a partial quotation of 45 U.S.C. § 797j. Defendants deny the remaining allegations in Paragraph 36.**

37.     Several "State[s] in the Region" have attempted to require minimum crew sizes notwithstanding the 3R Act's express preemption clause. Each time such a law or regulation has been challenged in litigation, the court has concluded that it was preempted under the 3R Act. *See*, *e.g.*, *Norfolk & W. Ry. Co. v. Pub. Serv. Comm'n of W.*

*Va.*, 858 F. Supp. 1213, 1217 (Reg'l Rail Reorg. Ct. 1994) (West Virginia minimum crew size law preempted); *Keeler v. Consol. Rail Corp.*, 582 F. Supp. 1546, 1550 (Reg'l Rail Reorg. Ct. 1984) (Indiana minimum crew size law preempted).

**ANSWER:** **Defendants deny the allegations in Paragraph 37.**

38.     Most recently, in 2021, the U.S. District Court for the Northern District of Illinois held that the 3R Act preempted Illinois' minimum crew size law. *See Ind. R.R. Co.*, 576 F. Supp. 3d 571. Like Ohio's Crew Size Law, Illinois' law provided that "No rail carrier shall operate or cause to operate a train or light engine used in connection with the movement of freight unless it has an operating crew of at least 2 individuals." *Id.* at 573.

**ANSWER:** **Defendants deny that the Illinois law was "like" Ohio's Crew Size Law.**

39.     As the court explained, "Illinois wants to mandate a crew size of two to perform the task, function or operation of moving freight with a train or light engine; this is exactly what the 3R Act prohibits." 576 F. Supp. 3d at 576. And because the 3R "Act defined a region that includes Illinois, and set out certain restrictions on how states in that region can regulate railroads … Illinois must abide by those restrictions." *Id.* at 577. But, "in passing the Crew Size Law, it failed to do so." *Id.* Thus, the court declared Illinois' crew size law preempted. *Id.*

**ANSWER:** **Defendants admit that Paragraph 39 contains partial quotations from** ***Ind. R.R. Co.*, 576 F. Supp. 3d 571. Defendants deny the remaining allegations in Paragraph 39.**

40.     "Historically, crew size has been an issue for labor relations." 81 Fed. Reg. at 13,937. That is, debates over crew size have historically been resolved through collective bargaining between railroads and unions rather than under the guise of safety regulation.

**ANSWER:   Defendants admit that Paragraph 40 contains partial quotations from _Train Crew Staffing_, 81 Fed. Reg. 13,918, 13,937 (Mar. 15, 2016) (notice of proposed rulemaking). Defendants lack knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 40.**

41.     At the federal level, FRA has historically declined to regulate minimum crew size, but instead recognized that railroads may operate with a single crew member in a variety of circumstances.

**ANSWER:   Defendants lack knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 41.**

42.     For example, in the 1990s, FRA "considered and promulgated regulations governing when blue signal protection had to be used when a lone engineer performed hostling or helper service." _Doyle_, 186 F.3d at 801. Initially, FRA issued a regulation permitting a one- person crew "to work on, under, or between rolling stock" in a railroad yard "without blue signal protection only if certain specified conditions were met." _Id._ at 799. But FRA later "suspended the regulation placing additional requirements on one-person crews," thereby permitting such operations to continue without restriction. _Id._ at 801.

**ANSWER:** **Defendants admit that Paragraph 42 contains partial quotations from** *BNSF Ry. Co. v. Doyle***, 186 F.3d 790 (7th Cir. 1999). Defendants lack knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 42.**

43.     Similarly, FRA has issued extensive regulations governing remote control operations. *See* 49 C.F.R. § 229.15 (2012). These regulations expressly contemplate and permit one-person crews in various contexts. *Id.* In 2001, FRA issued a safety advisory recognizing that remote control locomotives—that is, a "locomotive which, through use of a radio transmitter and receiver system, can be operated by a person not physically located at the controls within the confines of the locomotive cab"—had "been in use for a number of years." FRA, *Notice of Safety Advisory 2001-01*, 66 Fed. Reg. 10,340, 10,340 (Feb. 14, 2001). FRA issued guidance for conducting operations safely, while expressly declining to prohibit them. *See id.* at 10,343.

**ANSWER:** **Defendants admit that Paragraph 43 contains partial quotations from FRA,** *Notice of Safety Advisory 2001-01***, 66 Fed. Reg. 10,340 (Feb. 14, 2001). Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 43.**

44.     In 2009, FRA denied a petition from a labor union to prohibit one-person operating crews, including for remote control locomotive operations. *See Denial of BLET Petition on RCO and Other Single-Person Operations*, *supra*. FRA explained that it had "no factual evidence to support the prohibition against one-person crew operations." *Id.*

**ANSWER:** **Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 44.**

45.     In March 2016, FRA for the first time proposed regulations for minimum crew size. 81 Fed. Reg. 13,918. FRA acknowledged that it could not "provide reliable or conclusive statistical data to suggest whether one-person crew operations are generally safer or less safe than multiple-person crew operations." *Id.* at 13,919.

**ANSWER:** **Defendants admit that FRA issued a notice of proposed rulemaking in March 2016, which proposed regulations establishing minimum requirements for the size of train crew staffs depending on the type of operation. Defendants further admit that Paragraph 45 contains a partial quotation from Train Crew Staffing, 81 Fed. Reg. 13,919.**

46.     FRA's proposed regulations contemplated that one-person crew operations would be used in a variety of situations. For example, the minimum-crew-size requirement would not have applied to most helper service, lite locomotive, or certain remote control operations. 81 Fed. Reg. at 13,946-47. FRA also proposed an exception for small railroads, permitting them to use one-person crew operations where train speeds did not exceed 25 mph and at locations without heavy grades. *Id.* at 13,949.

**ANSWER:** **Defendants admit that the FRA's proposed regulations contained proposed exceptions to the proposed two-person crew minimum requirement. Defendants lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 46.**

47.     Moreover, FRA did not propose to stop existing one-person operations or to prohibit new operations. Instead, FRA proposed to review one-person operations on a case-by- case basis and generally "plan[ned] to approve operations with less than two crewmembers where a railroad provide[d] a thorough description of that operation, ha[d] sensibly assessed the risks associated with implementing it, and ha[d] taken appropriate measures to mitigate or address any risks or safety hazards that might arise from it." 81 Fed. Reg. at 13,957.

**ANSWER:   Defendants admit that the FRA proposed two different options for situations where a railroad wanted to continue an existing operation or start a new operation with less than two crew members as provided in 81 Fed. Reg. 13,918. Defendants further admit that Paragraph 47 contains a partial quotation of 81 Fed. Reg. at 13,957. Defendants deny the remaining allegations in Paragraph 47.**

48.     Before issuing the NPRM, FRA tasked the Railroad Safety Advisory Committee ("RSAC"), FRA's federal advisory committee that has representatives from all of the agency's major stakeholder groups, with considering appropriate train crew size. FRA lacked "reliable or conclusive statistical data to suggest whether one-person crew operations are safer or less safe than multiple-person crew operations." FRA, *Train Crew Staffing*, 84 Fed. Reg. 24,735, 24,735 (May 19, 2019). FRA "hoped that RSAC would provide useful analysis, including conclusive data addressing whether there is a safety benefit or detriment from crew redundancy (*i.e.*, multiple-person train crews) and a report on the costs and benefits associated with crew redundancy." *Id.* But "the RSAC Working Group was unable to reach consensus on any recommendation or identify

conclusive, statistical data to suggest whether there is a safety benefit or detriment from crew redundancy." *Id.* at 24,736. Thus, FRA issued the NPRM to "give the broader public an opportunity to provide input on th[e] issue." *Id.*

**ANSWER:**   **Defendants admit that Paragraph 48 contains partial quotations of 84 Fed. Reg. at 24,735 and 24,736. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 48.**

49.     After considering extensive comments and testimony, FRA found "that no regulation of train crew staffing is necessary or appropriate at this time." 84 Fed. Reg. at 24,737. The agency concluded: "[D]espite studying this issue in-depth and performing extensive outreach to industry stakeholders and the general public, FRA's statement in the NPRM that it 'cannot provide reliable or conclusive statistical data to suggest whether one-person crew operations are generally safer or less safe than multiple-person crew operations' still holds true." *Id.*

**ANSWER:**   **Defendants admit that Paragraph 49 contains partial quotations of 84 Fed. Reg. at 24,737. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 49.**

50.     In particular, "FRA's accident/incident safety data do[ ] not establish that one- person operations are less safe than multi-person train crews." 84 Fed. Reg. at 24,739 (footnote omitted). Reviewing data from a seventeen-year period ending in 2018, FRA "could not determine that *any* of the accidents/incidents involving a one-person crew would have been prevented by having multiple crewmembers." *Id.* (emphasis added). Indeed, "existing one- person operations 'have not yet raised serious safety

concerns' and, in fact, 'it is possible that one-person crews have contributed to the [railroads'] improving safety record.'" *Id.*

**ANSWER:** **Defendants admit that Paragraph 50 contains partial quotations from 84 Fed. Reg. at 24,739. Defendants deny that existing one-person operations have not raised serious safety concerns.**

51.    Moreover, the comments FRA received did "not provide conclusive data suggesting that there have been any previous accidents involving one-person crew operations that could have been avoided by adding a second crewmember or that one-person crew operations are less safe." 84 Fed. Reg. at 24,740.

**ANSWER:** **Defendants admit that Paragraph 51 contains a partial quotation from 84 Fed. Reg. at 24,740. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 51.**

52.    Although FRA's extensive review did not suggest any safety *benefits* from establishing minimum-crew-size requirements, FRA concluded that establishing those requirements would impose significant *costs*. Specifically, "[a] train crew staffing rule would unnecessarily impede the future of rail innovation and automation." 84 Fed. Reg. at 24,740 (cleaned up). FRA explained that the Department of Transportation ("DOT") had "recognized that the integration of technology and automation across our transportation system has the potential to increase productivity, facilitate freight movement, create new kinds of jobs, and, most importantly, improve safety significantly by reducing accidents caused by human error." *Id.* "DOT's approach to achieving safety improvements begins with a focus on removing unnecessary barriers and issuing

voluntary guidance, rather than regulations that could stifle innovation." *Id.* Establishing

minimum-crew-size requirements would have imposed "a potential barrier to automation

or other technology improvements" and could not be justified "without sufficient safety

data showing the need for such a rule." *Id.*

**ANSWER:** **Defendants admit that Paragraph 52 contains partial quotations of 84**

**Fed. Reg. at 24,740. Defendants deny the remaining allegations in Paragraph 52.**

53.     Thus, FRA decided to withdraw the NPRM, publishing a final order to that

effect on May 29, 2019. In doing so, FRA "determined that no regulation of train crew

staffing is necessary or appropriate at this time and intend[ed] for the withdrawal to

preempt all state laws attempting to regulate train crew staffing in any manner." 84 Fed.

Reg. at 24,741.

**ANSWER:** **Defendants admit that FRA withdrew the NPRM on May 29, 2019, and**

**that Paragraph 53 contains a partial quotation of 84 Fed. Reg. at 24,741.**

54.     In 2021, a panel of the U.S. Court of Appeals for the Ninth Circuit vacated

the withdrawal order. *See Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail & Transp.*

*Workers v. FRA*, 988 F.3d 1170 (9th Cir. 2021). The court "conclude[d] that the issuance

of the Order violated the APA's notice-and-comment requirements and that the Order is

arbitrary and capricious." *Id*. at 1179. But the court did *not* conclude that a crew-size rule

was warranted or that the evidence showed two-person crews would increase safety.

**ANSWER:** **Defendants admit that Paragraph 54 contains partial quotations from**

***Transp. Div. of Int'l Ass'n of Sheet Metal, Air, Rail & Transp. Workers v. FRA*, 988**

**F.3d 1170 (9th Cir. 2021). Defendants lack knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 54.**

55. In 2022, the FRA issued a new NPRM entitled *Train Crew Size Safety Requirements*, 87 Fed. Reg. 45,564.

**ANSWER: Defendants admit the allegations in Paragraph 55.**

56. In the NPRM, FRA recognized that one-person crews have been used for decades in specific circumstances. For example, "over the last 25 years, remotely controlled locomotive operations utilizing only a one-person crew for switching service have become commonplace." 87 Fed. Reg. at 45,567. Similarly, "railroads commonly use one-person crews safely in helper service"—that is, "a train that is assisting another train that has incurred a mechanical failure or lacks the power to traverse difficult terrain." *Id.* at 45,565. And several short line railroads have used one-person crews for over-the-road operations safely for many years. *See id.* at 45,568.

**ANSWER: Defendants admit that Paragraph 56 contains partial quotations from *Train Crew Size Safety Requirements,* 87 Fed Reg. 45,564, 45,567 (July 28, 2022) (notice of proposed rulemaking). Defendants lack knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 56.**

57. Generally, the NPRM requires railroads that wish to transition to operations with fewer than two crewmembers "to consider and address the safety risks of doing so by conducting a risk assessment of the proposed operation." 87 Fed. Reg. at 45,564.

**ANSWER:   Defendants admit that Paragraph 57 contains partial quotations from** *Train Crew Size Safety Requirements,* **87 Fed Reg. 45,564 (July 28, 2022) (notice of proposed rulemaking). Defendants lack knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 57.**

58.     FRA proposed to categorically exempt "helper service" and "lite locomotive" operations from any crew size mandate. *See* 87 Fed. Reg. at 45,617 ("The train is performing helper service, *i.e.*, using a locomotive or group of locomotives to assist another train that has incurred mechanical failure or lacks the power to traverse difficult terrain. Helper service includes traveling to or from a location where assistance is provided" or "[t]he train is a locomotive or a consist of locomotives not attached to any piece of equipment or attached only to a caboose.").

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58.**

59.     FRA also proposed to exempt certain small railroad operations and remote control operations from any crew size mandate. *See* 87 Fed. Reg. at 45,618.

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59.**

60.     And FRA proposed a special approval process for continuance of legacy train operations staffed with a one-person train crew. *See* 87 Fed. Reg. at 45,618.

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60.**

61.     FRA has not yet finalized its proposed train crew staffing rule.

**ANSWER:** **Defendants admit the allegations in Paragraph 61.**

62. On March 31, 2023, Governor DeWine signed the Crew Size Law, codified at Ohio Rev. Code § 4999.09, into law.

**ANSWER:** **Defendants admit the allegations in Paragraph 62.**

63. Section 4999.09(A) states that the Crew Size Law's requirements "are solely related to safety, including ensuring that no train or light engine used in connection with the movement of freight in this state is left without a functional crew person as a result of a medical emergency."

**ANSWER:** **Defendants admit the allegations in Paragraph 63.**

64. Section 4999.09(B) provides that "[a] train or light engine used in connection with the movement of freight shall have a crew that consists of at least two individuals" and states that "[n]o superintendent, trainmaster, or other employee of a railroad shall order or otherwise require a train or light engine used in connection with the movement of freight to be operated unless it has a crew that consists of at least two individuals."

**ANSWER:** **Defendants admit the allegations in Paragraph 64.**

65. Unlike FRA's proposed regulation, which includes significant exceptions from its two-person crew requirement for particular types of trains or trains operating under specified conditions, establishes a special approval process for existing one-person crew operations, and contemplates new one-person operations with FRA approval, the Crew Size Law applies to every train or light engine used in connection with the

movement of freight, except for "hostler service or utility employees." Ohio Rev. Code § 4999.09(B).

**ANSWER: Defendants admit that, as used in Ohio Rev. Code § 4999.09(B), "train or light engine used in connection with the movement of freight" does not include hostler service or utility employees. Defendants deny the remaining allegations in Paragraph 65.**

66. The Public Utilities Commission is authorized to "assess a civil penalty against a person who willfully violates" the Crew Size Law's requirements. Ohio Rev. Code § 4999.09(C)(1). Those penalties can range from $250 to $10,000. *Id.* § 4999.09(C)(1)(a)-(c).

**ANSWER: Defendants admit the allegation in Paragraph 66 to the extent that the Public Utilities Commission may assess a civil penalty against a person who willfully violates Ohio Rev. Code § 4999.09(B) pursuant to Ohio Rev. Code § 4999.09(C), and further that if the Commission does assess a penalty it can range from $250-$1,000 for a first violation and up to $10,000 for a third or more violations occurring within three years.**

67. The Attorney General, "upon the request of the public utilities commission, shall bring a civil action to collect the penalties described in division (C)(1) of this section." Ohio Rev. Code § 4999.09(C)(2).

**ANSWER: Defendants admit the allegations in Paragraph 67.**

68. The Crew Size Law takes effect on June 30, 2023.

**ANSWER: Defendants admit the allegations in Paragraph 68.**

69.     AAR members operating in Ohio must comply with the Crew Size Law as of June 30, 2023. Failure to comply with the Crew Size Law could result in significant penalties, while complying with the Crew Size Law will require AAR's members to give up their rights under federal law.

**ANSWER:   Defendants admit that Ohio Rev. Code § 4999.09 became effective June 30, 2023. Defendants deny the remaining allegations in Paragraph 69.**

70.     The Crew Size Law thus will present AAR's members with the Hobson's choice of complying with the Crew Size Law or suffering the threat of significant penalties. *See*, *e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("irreparable injury" existed where states "made clear that they would seek to enforce" law and plaintiffs faced "Hobson's choice" of "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying" law); *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1334 (11th Cir. 2014) ("[a]bsent an injunction, [plaintiffs] will be forced either to incur the costs of compliance with a preempted state law or face the possibility of penalties").

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70.**

71.     AAR's members that operate in Ohio face the loss of their ability to use one- person crews for specific operations. For example, AAR's members currently have the ability under their labor agreements to use one-person crews to operate remote control locomotives in Ohio. AAR requested confirmation from the Ohio Attorney General that such operations are not restricted by the Crew Size Law, which expressly exempts

"hostler service or utility employees." Ohio Rev. Code § 4999.09(B). Yet the Ohio Attorney General declined to "agree to an interpretation that would exempt in-yard service from the prescribed crew size standards." As a result, AAR's members will face uncertainty about the continuing ability to exercise their operational rights with respect to in-yard remote control operations as soon as the Crew Size Law becomes effective.

**ANSWER: Defendants acknowledge that AAR requested that the office of the Ohio Attorney General provide an interpretation of Ohio Rev. Code § 4999.09(B). Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 71.**

72.     AAR's members will also suffer harm to their rights to collectively bargain over crew size. The carriers that operate in Ohio have the right to bargain for system-wide changes in crew size. The Crew Size Law will interfere with the railroads' ability to expand their rights to operate with one-person crews in Ohio through collective bargaining.

**ANSWER: Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72.**

73.     Plaintiff's members have no adequate remedy at law for these harms that they will suffer, and therefore injunctive relief is appropriate.

**ANSWER: Defendants deny the allegations in Paragraph 73.**

74.     Plaintiff incorporates all preceding paragraphs by reference.

**ANSWER: Defendants incorporate all of their preceding answers to all of the preceding paragraphs by reference in response to the allegations in Paragraph 74.**

75.    When a state or local law conflicts with or stands as an obstacle to the objectives of a federal law or intrudes on a field that Congress reserved for the federal government, the Supremacy Clause of the Constitution of the United States preempts that state or local law.

**ANSWER:    Paragraph 75 contains a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny that Ohio Rev. Code § 4999.09 is preempted by federal law.**

76.    The Crew Size Law conflicts with and is expressly preempted by Section 711 of the Regional Rail Reorganization Act ("3R Act"), as amended by Section 1143(a) of the Northeast Rail Service Act, 45 U.S.C. § 797j.

**ANSWER:    Defendants deny the allegations in Paragraph 76.**

77.    As amended, Section 711 of the 3R Act provides that: No State may adopt or continue in force any law, rule, regulation, order, or standard requiring the Corporation [Conrail] to employ any specified number of persons to perform any particular task, function, or operation, or requiring the Corporation to pay protective benefits to employees, and *no State in the Region may adopt or continue in force any such law, rule, regulation, order, or standard with respect to any railroad in the Region*. 45 U.S.C. § 797j (emphasis added).

**ANSWER:    Defendants admit the allegations in Paragraph 77 but deny that any language in the amendment is italicized.**

78.    Ohio is a "State in the Region" as defined by Section 102 of the 3R Act, *see* 45 U.S.C. § 702(17), (19).

**ANSWER:**   **Defendants admit the allegations in Paragraph 78.**

79.    The railroads that operate in Ohio are "railroad[s] in the Region" as defined by Section 102 of the 3R Act, *see* 45 U.S.C. § 702(15), (17).

**ANSWER:**   **Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 79.**

80.    As the statutory text reflects, this express preemption provision applies to *all* railroads in the specified area, not just to Conrail and its successors. *See Norfolk & W. Ry. Co. v. Pub. Utils. Comm'n of Ohio*, 582 F. Supp. 1552, 1556 (Reg'l Rail Reorg. Ct. 1984) ("The legislative goal was to give Conrail the opportunity to become profitable, but not necessarily to disadvantage all other railroads at the same time.").

**ANSWER:**   **Defendants admit that Paragraph 80 contains a partial quotation from *Norfok & W. Ry. Co. v. Pub. Utils. Comm'n of Ohio*, 582, F. Supp. 1552 (1984). Defendants deny the remaining allegations in Paragraph 80.**

81.    Because the Crew Size Law specifies that "at least two individuals" must be used to operate any freight train or light engine, Ohio Rev. Code § 4999.09(B), it is a "law" requiring a "specified number of persons to perform any particular task, function, or operation," 45 U.S.C. § 797j.

**ANSWER:**   **Defendants deny the allegations in Paragraph 81.**

82.    Because the Crew Size Law requires freight railroads in the Region to employ a specified number of persons to operate any train or light engine, it conflicts with and is preempted by the 3R Act, as amended. *See, e.g.*, *Ind. R.R. Co.*, 576 F. Supp. 3d at 577 (Illinois two-person crew law preempted).

**ANSWER: Defendants deny the allegations in Paragraph 82.**

83. Plaintiff incorporates all preceding paragraphs by reference.

**ANSWER: Defendants incorporate all of their preceding answers to all of the preceding paragraphs by reference in response to the allegations in Paragraph 83.**

84. When a state or local law conflicts with or stands as an obstacle to the objectives of a federal law or intrudes on a field that Congress reserved for the federal government, the Supremacy Clause of the Constitution of the United States preempts that state or local law.

**ANSWER: Paragraph 84 contains a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny that Ohio Rev. Code § 4999.09 is preempted by federal law.**

85. The Crew Size Law conflicts with and is preempted by ICCTA, which provides that "[t]he jurisdiction of the [STB] over … transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers… is *exclusive*." 49 U.S.C. § 10501(b) (emphasis added).

**ANSWER: Defendants admit that Paragraph 85 contains a partial quotation of 49 U.S.C. § 10501(b). Defendants deny the remaining allegations in Paragraph 85.**

86. Because ICCTA's remedies are "exclusive," they "preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).

**ANSWER: Defendants admit the allegations in Paragraph 86, but deny that the ICCTA preempts Ohio Rev. Code § 4999.09 or is applicable here.**

87.    "Congress's intent in [ICCTA] to preempt state and local regulation of railroad transportation has been recognized as broad and sweeping." *Union Pac. R.R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 678 & n.1 (7th Cir. 2011) (collecting cases). "Congress recognized that continuing state regulation—of intrastate rail rates, for example—would risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation." *Iowa, Chi. & E. R.R. Corp. v. Wash. Cty.*, 384 F.3d 557, 559 (8th Cir. 2004).

**ANSWER:**   **Defendants admit that Paragraph 87 contains partial quotations from *Union Pac. R.R. Co. v. Chi. Transit Auth.*, 647 F.3d 675 (7th Cir. 2011) and *Iowa, Chi. & E. R.R. Corp. v. Wash. Cty.*, 384 F.3d 557 (8th Cir. 2004).**

88.    ICCTA "preempts *all* state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Delaware v. STB*, 859 F.3d 16, 18 (D.C. Cir. 2017) (emphasis added). "[S]tate or local statutes or regulations are preempted *categorically* if they have the effect of managing or governing rail transportation." *Id.* at 19 (emphasis added; quotation marks omitted). And even state laws "that are not categorically preempted may still be impermissible if, as applied, they would have the effect of unreasonably burdening or interfering with rail transportation." *Id.*

**ANSWER:**   **Defendants admit that Paragraph 88 contains partial quotations from *Delaware v. STB*, 859 F.3d 16 (D.C. Cir. 2017).**

89.     The Crew Size Law conflicts with and is preempted by ICCTA because it will manage, govern, unreasonably burden, and unreasonably interfere with rail transportation. When the Crew Size Law takes effect, it will forbid freight railroads from operating with a single crew member. Under the Law, it does not matter whether operating with a single crew member is just as safe as—or even safer than—operating with multiple crew members, whether a railroad operates with a single crew member in adjacent states, or even whether the railroad has a collective bargaining agreement permitting single-person operations. The Crew Size Law thus imposes the balkanized system of transportation regulations that ICCTA was designed to prevent.

**ANSWER:   Defendants deny the allegations in Paragraph 89.**

90.     Plaintiff incorporates all preceding paragraphs by reference.

**ANSWER:   Defendants incorporate all of their preceding answers to all of the preceding paragraphs by reference in response to the allegations in Paragraph 90.**

91.     When a state or local law conflicts with or stands as an obstacle to the objectives of a federal law or intrudes on a field that Congress reserved for the federal government, the Supremacy Clause of the Constitution of the United States preempts that state or local law.

**ANSWER:   Paragraph 91 contains a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny that Ohio Rev. Code § 4999.09 is preempted by federal law.**

34

92.     The Crew Size Law is expressly preempted by FRSA, 49 U.S.C. § 20106, to the extent that it requires two-person crews for helper service and/or remote control operations.

**ANSWER:   Paragraph 92 contains a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny that Ohio Rev. Code § 4999.09 is preempted by federal law.**

93.     In FRSA, Congress directed that "[l]aws, regulations, and orders related to railroad safety" must be "nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1). To secure national uniformity, FRSA provides that a state law is preempted when FRA, under authority delegated from the Secretary of Transportation, "prescribes a regulation or issues an order covering the subject matter of the State requirement." *Id.* § 20106(a)(2). A federal regulation or order covers the subject matter of a state law when "the federal regulations substantially subsume the subject matter of the relevant state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).

**ANSWER:   Paragraph 93 contains a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny that Ohio Rev. Code § 4999.09 is preempted by federal law.**

94.     As the Sixth Circuit has explained, FRA's "explicit refusal to adopt a regulation" regarding a particular subject matter amounts to "a determination" that no such regulation is "appropriate, and thus amount[s] to negative preemption" of any such state regulation. *Norfolk & W. Ry. Co.*, 926 F.2d at 570. In other words, when "FRA examines a safety concern regarding an activity and affirmatively decides that no

regulation is needed, this has the effect of being an order that the activity is permitted." *Doyle*, 186 F.3d at 801.

**ANSWER:** **Defendants admit that Paragraph 94 contains partial quotations from** ***Norfolk & W. Ry. Co. v. Pub. Utilities Comm'n*, 926 F.2d 567 and *BNSF Ry. Co. v. Doyle*, 186 F.3d 790 (7th Cir. 1999).**

95.     That is exactly what FRA did with respect to helper service. As the Seventh Circuit explained in *Doyle*, "FRA considered and promulgated regulations governing when blue signal protection had to be used when a lone engineer performed … helper service." 186 F.3d at 801. It then "suspended the regulation placing additional requirements on one-person crews." *Id.* As that process showed, FRA "considered the issue of safety for one-person crews conducting" helper service "and whether additional precautions were needed," and "ultimately decided not to impose any." *Id.* FRA's "specific conclusion that" helper service was "safe without added precautions encompasses the more general one that they are safe." *Id.* at 802. Thus, Ohio's "requirement that two persons conduct [such] operations directly contradicts"—and is preempted by—"FRA's decision that one person may do them safely." *Id.*

**ANSWER:** **Defendants admit that Paragraph 95 contains partial quotations from** ***Norfolk & W. Ry. Co. v. Pub. Utilities Comm'n*, 926 F.2d 567 and *BNSF Ry. Co. v. Doyle*, 186 F.3d 790 (7th Cir. 1999). Defendants deny the remaining allegations contained in Paragraph 95, and deny that Ohio Rev. Code § 4999.09 is preempted by federal law.**

36

96.     That is also what FRA did with respect to remote control operations in yards. In 2001, FRA issued a safety advisory to provide guidance for conducting such operations safely, while expressly declining to prohibit them. 66 Fed. Reg. at 10,343. In 2009, FRA denied a petition from a labor union to prohibit one-person operating crews, including remote control locomotive operations. *See Denial of BLET Petition on RCO and Other Single-Person Operations*, *supra*. And FRA has since promulgated extensive regulations covering remote control operations, without prohibiting one-person crews. *See* 49 C.F.R. § 229.15.

**ANSWER:   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 96.**

97.     Notably, although FRA is currently considering whether to adopt a nationwide crew size rule, its proposed rule categorically exempts both helper service and remote control operations, thus preserving the status quo—no minimum crew size regulation is necessary or appropriate. *See* 87 Fed. Reg. at 45,617-18.

**ANSWER:   Defendants deny the allegations contained in Paragraph 97.**

98.     The Crew Size Law requires two-person crews for every train or light engine used in connection with the movement of freight, except for "hostler service or utility employees." Ohio Rev. Code § 4999.09(B).

**ANSWER:   Defendants admit that Paragraph 98 to the extent that Ohio Rev. Code § 4999.09(B) requires that a train or light engine used in connection with the movement of freight shall have a crew that consists of at least two individuals, and**

**further that, as used in this division, "train or light engine used in connection with the movement of freight" does not include hostler service or utility employees.**

99.    The Crew Size Law is preempted by FRSA to the extent it mandates a minimum number of crew members for helper service or remote control operations. FRA's "order[s] covering the subject matter" of minimum crew size for such operations leave no room for Ohio to adopt or continue in force a law regulating train crew staffing for them. 49 U.S.C. § 20106(a)(2).

**ANSWER:    Paragraph 99 contains a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny that Ohio Rev. Code § 4999.09 is preempted by federal law.**

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff AAR respectfully requests that this Court:

A.    Declare that the Crew Size Law violates and is preempted by the 3r Act, as amended, ICCTA, and in part by FRSA;

B.    Preliminarily and permanently enjoin Defendants, as well as their officers, agents, servants, employees, and attorneys, and those persons acting in concert or participation with them, from taking any action to enforce the Crew Size Law against AAR or its members; and

C.    Grant AAR any other relief this Court deems just and proper.

**ANSWER:    Defendants deny that Plaintiff is entitled to any of the relief that it has requested to the Court above.**

## AFFIRMATIVE DEFENSES

1.  Any claim asserted by the Plaintiff against Defendants Jenifer French, Daniel R. Conway, Dennis P. Deters, Lawrence K. Friedeman, and John D. Williams, Commissioners of the Public Utilities Commission of Ohio in their official capacities, or against the Public Utilities Commission of Ohio, a state agency, is barred by the Eleventh Amendment, U.S. Const. amend. XI.

2.  Plaintiff's Complaint claiming Ohio Rev. Code § 4999.09 is expressly preempted by 45 U.S.C § 797j ("3R Act"), 49 U.S.C. §10501(b) ("ICCTA"), and 49 U.S.C. § 20106 ("FRSA") fails to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) that would entitle it to any relief by the Court against Defendants Jenifer French, Daniel R. Conway, Dennis P. Deters, Lawrence K. Friedeman, and John D. Williams, Commissioners of the Public Utilities Commission of Ohio in their official capacities. The requirements in Ohio Rev. Code § 4999.09 are solely related to safety, including ensuring that no train or light engine used in connection with the movement of freight in Ohio is left without a functional crew person as a result of a medical emergency; an exception from the two individuals crew requirement in Ohio Rev. Code § 4999.09(B) is expressly and plainly made for hostler service or utility employees operating a train or light engine used in connection with the movement of freight; and, pursuant to division (D) of the section, the requirements of Ohio Rev. Code § 4999.09 do not apply

on and after the date a federal law or regulation takes effect requiring a

train or light engine used in connection with the movement of freight in this

state to have a crew of at least two individuals.

3. Plaintiff's Complaint fails to state a claim pursuant to Fed. R. Civ. P. 12

(b)(6) because the FRSA explicitly permits a State to "adopt or continue in

force a law, regulation, or order related to railroad safety…until the

Secretary of Transportation…prescribes a regulation or issues an order

covering the subject matter of the State requirement." 49 U.S.C.

§20106(a)(2). As Plaintiffs have admitted in Paragraph 61 of their

Complaint, the "FRA has not yet finalized its proposed train crew staffing

rule." Thus, until such time as the FRA acts by prescribing a regulation or

issuing an order on train crew staffing, there is no case of FRSA

preemption of Ohio Rev. Code §4999.09 for the Court to consider. Ohio's

crew size law is permitted under Section 20106(a)(2).

4. Plaintiff's Complaint should be dismissed pursuant to Fed. R. Civ. P. 12

(b)(1) based on a lack of subject matter jurisdiction. Article III standing is a

question of subject matter jurisdiction properly decided under Fed. R. Civ.

P. 12(b)(1). *See Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014).

The plaintiff bears the burden of demonstrating that jurisdiction exists. *Id*.

at 760. Here, Plaintiff only seeks to establish associational standing

(Complaint paragraph 22). "To establish Article III standing, a party must

meet three requirements: (1) 'he must demonstrate injury in fact--a harm

that is both concrete and actual or imminent, not conjectural or hypothetical'; (2) 'he must establish causation—a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant'; and (3) 'he must demonstrate redressability—a substantial likelihood that the requested relief will remedy the alleged injury in fact.'" *Davis v. Detroit Pub. Schs. Cmty. Dist*., 899 F.3d 437, 443-444 (6th Cir. 2018) (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)). Plaintiff brings a pre-enforcement action seeking declaratory and injunctive relief in which it alleges that its "members face the 'immediate or threated injury' of enforcement actions." (Complaint paragraph 22, quoting *Hunt v. Wash State Apple Advert. Comm'n*, 432 U.S. 333, 342 (1977)). "However, 'when seeking declaratory and injunctive relief, a plaintiff must show actual present harm or a significant possibility of future harm in order to demonstrate the need for pre-enforcement review'" *Grendell v.Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001) (quoting *Nat'l Rifle Assoc. of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). Additionally, the harm cannot be "conjectural or 'hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). In the Complaint, Plaintiff alleges speculative or hypothetical harm rather than actual harm or immediate or threatened injury caused by the Defendants. Plaintiff does not allege that a compliance or complaint case to enforce the Crew Size Law was filed or is pending with the Commission or that any of its Ohio

members are currently under investigation or a target for compliance with the law. Ohio's Crew Size Law provides exceptions to a crew consisting of two individuals for hostler service and utility employees working in the train yards moving a locomotive, and assembling and disassembling trains; therefore, it is speculative to assume that a complaint alleging a violation of Ohio Rev. Code §4999.09(B) would result in the Commission finding an AAR member in violation of the law. The same is true for "helper service" and "remote control operations" because no facts have been presented to the Commission to decide the issue. Ohio's Crew Size Law is new, never been applied to any facts, and is subject to interpretation by the Commission, so it cannot be assumed that the Defendants, acting as the Commission, would find that an AAR member "willfully violate[d]" Ohio Rev. Code §4999.09(B). (Ohio Rev. Code §4999.09(C)(1)). Finally, the Defendants, acting as the Commission, have the discretion to asses a civil penalty if they find that a person violated Ohio Rev. Code §4999.09(B). *Id.* Plaintiff makes assumptions on all of these points. And such a chain of events is simply too attenuated to establish injury in fact, and to confer the required standing in this case. *See Grendell*, 252 F.3d at 833. Plaintiff has failed to allege an injury in fact against the Defendants and therefore, Plaintiff's Complaint should be dismissed.

Dated: August 10, 2023

Respectfully submitted,

**Dave Yost**
Ohio Attorney General

**John Jones**
Section Chief

*/s/ Werner L. Margard III*

**Werner L. Margard III** (0024858)
**Robert A. Eubanks** (0073386)
**Amy Botschner O'Brien** (0074423)
Assistant Attorneys General
Public Utilities Section
30 East Broad Street, 26th Floor
Columbus, OH 43215
(614) 466-4397
FAX: (614) 644-8764
Werner.Margard@OhioAGO.gov
Robert.Eubanks@OhioAGO.gov
Amy.BotschnerOBrien@OhioAGO.gov

**On Behalf of Defendants Jenifer
French, Daniel R. Conway, Dennis P.
Deters, Lawrence K. Friedeman, and
John D. Williams**