**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO**

| | |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS, <br><br> Plaintiff, <br><br> v. <br><br> JENIFER FRENCH, <br> DANIEL R. CONWAY, <br> DENNIS P. DETERS, <br> LAWRENCE K. FRIEDEMAN, and <br> JOHN D. WILLIAMS, <br>  *Commissioners of the Ohio Public Utilities Commission*, <br> in their official capacities, <br><br> Defendants. | Case No. 2:23-cv-02096-MHW-KAJ <br><br> Judge Michael H. Watson <br><br> Magistrate Judge Kimberly A. Jolson <br><br> **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Ohio is a major crossroads for the railroad industry. With approximately 5,000 miles of track and 5,665 public grade crossings and 36 freight railroads operating within our state, Ohio has the fifth highest rail traffic in the country.[1] As part of its efforts to protect Ohioans from risks associated with this high volume of rail traffic, the Ohio Legislature created a new statute in 2023 requiring a minimum 2-person crew for a train moving freight. Ohio Rev. Code 4999.09. The requirement is consistent with current industry practice, as reported by the Federal Railroad Administration (FRA) and the practice of Plaintiff Association of American Railroads (AAR), as reflected in applicable collective bargaining agreements. 87 Fed. Reg. 45,578. The same practice is followed by smaller Class II and III or smaller freight railroads with the exception of seven

---

[1] https://puco.ohio.gov/transportation/railroad/resources/rail-stats

1

small railroads across the country and none of them operate in Ohio. *Id*. Finally, in regard to passenger railroads, the FRA stated that multiple crewmembers are typically necessary on passenger trains. *Id* at 45,579.

AAR's claims lack merit. The FRA has not issued a regulation on crew size that would preempt Ohio Rev. Code 4999.09 (Crew Size Law). The Interstate Commerce Commission Termination Act (Termination Act) does not address crew size or impose any railroad safety regulations. Ohio's Crew Size Law does not conflict with, and is not preempted by the Regional Rail Reorganization Act (3R Act), because of no application, no economic harm, and it is solely related to safety. Ohio's Crew Size Law has no application to helper service, switching service, and remote control operations (RCO). The 3R Act is unconstitutional for having a disparate impact and treatment among States by prohibiting 17 States, including Ohio, from using their police powers to pursue legislative objectives; specifically, the power to regulate train crew sizes solely related to safety when the FRA has not acted to adopt a rule or regulation on this subject matter. For these reasons, the Court should grant the Defendants' motion for summary judgment and dismiss AAR's Complaint because it fails to establish a genuine dispute as to any material fact and Defendants are entitled to judgment as a matter of law.

## BACKGROUND

On February 3, 2023, 38 cars of a Norfolk Southern freight train careened off the tracks in East Palestine, Ohio, and ignited a dayslong fire.[2] The town has a population of about 4800 people near the border with Pennsylvania.[3] At least 11 of the cars contained hazardous materials,

---

[2] https://www.npr.org/2023/03/31/1167393135/the-justice-department-adds-to-suits-against-norfolk-southern-over-the-ohio-dera
[3] https://www.npr.org/2023/02/16/1157333630/east-palestine-ohio-train-derailment

2

including vinyl chloride, butyl acrylate, ethyl hexyl acrylate, as well as benzene residue from past shipments.[4] Ultimately, officials decided to pursue a "controlled release" of the volatile vinyl chloride.[5] Officials ordered the evacuation of a one-by-two-mile area around East Palestine, on both sides of the state line. *Id*.

On June 29, 2023, AAR filed this Complaint for Declaratory and Injunctive Relief and Claim of Unconstitutionality (Complaint). In its Preliminary Statement, AAR concedes that Congress and the FRA have allowed railroads to set minimum crew sizes through collective bargaining, rather than imposing such requirements by law. Complaint ¶ 1. Defendants' agree with that statement.

Shortly after the tragic train derailment in East Palestine, Ohio, Ohio Rev. Code 4999.09 titled "Train or light engine safety" (Crew Size Law), took effect June 30, 2023. See copy of Ohio Rev. Code 4999.09 attached as Exhibit A.

**STANDARD FOR EXISTENCE OF CASE OR CONTROVESY**

Mere possibility or even probability that person may be adversely affected in future by official act does not create "actual controversy" within meaning of Declaratory Judgment Act under 28 USCS § 2201. *Dawson v. Department of Transp.,* 480 F. Supp. 351 (W.D. Okla. 1979). Dispute of hypothetical, abstract, or academic nature is not justiciable controversy, so no declaratory relief may be granted. *Lebowich v. O'Connor*, 309 F.2d 111 (2d Cir. 1962). Question of constitutionality cannot be raised as abstract question. *Grocer's Co-op. Dairy Co. v. Grand Haven,* 79 F. Supp. 938 (D. Mich. 1948).

---

[4] https://www.npr.org/2023/03/31/1167393135/the-justice-department-adds-to-suits-against-norfolk-southern-over-the-ohio-dera
[5] https://www.npr.org/2023/02/16/1157333630/east-palestine-ohio-train-derailment

3

# ARGUMENT

**I.    PLAINTIFF HAS NO INJURY-IN-FACT TO CONFER ARTICLE THREE STANDING TO BRING ITS COMPLAINT CLAIMING PREEMPTION AND UNCONSTITIONALITY OF R.C. 4999.09.**

The U.S. Supreme Court addressed the limitation of federal-court jurisdiction with the concept of standing, as follows:

> No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies. See *Flast v. Cohen*, 392 U.S. 83, 95 (1968). The concept of standing is part of this limitation.

*Simon v. E. Ky. Welfare Rights Org*., 426 U.S. 26, 37 (1976).

The Court has recognized that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the United States Supreme Court identified three requirements for standing in a federal court:

(1) Injury in Fact: This involves an "invasion of a legally protected interest" that is also "concrete and particularized" and is "actual or imminent," as opposed to "conjectural or hypothetical." This injury does not have to be an economic injury, so long as it is one directly affecting the plaintiff.

(2) Causation: A plaintiff's injury must be "fairly traceable" to the conduct that is the subject of the lawsuit and cannot have resulted from actions by someone who is not a party to the lawsuit. *Id.*

(3) Likelihood of Redress: The redress requested by the plaintiff must be "likely" and more than "merely speculative," and provide an adequate remedy for the plaintiff's injuries.

*Lujan*, 504 U.S. at 560-561. In 2016, the U.S. Supreme Court decided the case of *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-40 (2016), in which it addressed the "injury in fact" element, holding

that a plaintiff seeking redress for a statutory violation must show a "concrete injury" as opposed to a purely procedural or technical violation of the statute. The Sixth Circuit Court of Appeals expanded on the meaning of "concrete injury," holding that it meant an injury that is "real, not abstract, actual, not theoretical, concrete, not amorphous." *Huff v. Telecheck Servs., Inc.*, 923 F.3d 458, 462 (6th Cir. 2019): citing, *Spokeo*, 578 U.S. at 339.

> **A.** **Ohio's Crew Size Law requirement is consistent with AAR's members crew size requirements in their collective bargaining agreements, which have remained unchanged for decades.**

AAR admitted in its Complaint (¶ 1) that train crew sizes are determined through collective bargaining, not Congress. In attached Exhibit B, Mark Wallace, First Vice President of the Brotherhood of Locomotive Engineers and Trainman (BLET), provided its collective bargaining agreements (CBA) with CSX (Article 60), Canadian National Railway (Article 4), and Norfolk Southern (Article XI). The CBAs for these three Class I railroads, which are representative of all AAR members, show they operate with a minimum train crew of two consisting of an engineer and a conductor. Mark Wallace states the typical size of a train crew in Ohio and in all states in which these three railroads operate consists of a minimum of one engineer and one conductor. Exhibit B ¶¶ 5, 8 and 11. Also, see the Declaration of Jamie Modesitt attached as Exhibit C. In his declaration, Modesitt confirms that all trains operating in Ohio consist of two-person crews consisting of an engineer and a conductor. *Id*. at ¶¶ 5-6. This evidence shows that Ohio's train Crew Size Law does not conflict with AAR's members crew size in their CBAs, which requires two individuals. No injury-in-fact can be shown by AAR or its members as to the Defendants' application and enforcement of Ohio Rev. Code 4999.09 to train operations in Ohio.

AAR acknowledged in its Complaint ¶ 40 that crew size has historically been an issue for labor relations and resolved through collective bargaining. AAR's hypothetical and conclusory claim (Complaint ¶ 72) that its members will suffer harm to their rights to collectively bargain over crew size and expand their rights to operate with one-person crews in Ohio is not sufficient to show a concrete injury. AAR's claim is abstract and theoretical. AAR has made no allegation or claim that its members have or are currently attempting to negotiate new CBAs on crew size with less than two individuals. In the aftermath of East Palestine, the idea of negotiating less than a two-person crew for railroad operations in Ohio is not a reality or believable.

      **B.**      **Ohio's Crew Size Law has no application to hostler service or utility employees.**

Ohio's Crew Size Law provides express exceptions for "hostler service or utility employees." Ohio Rev. Code 4999.09 (B). See also Complaint ¶ 7. In the Declaration of Mark Wallace, see Exhibit B, the industry usage and definition of "hostler service" involves moving locomotives within a railroad yard to various locations for fuel, cleaning, service, and repair. Exhibit B ¶ 12. It does not involve the movement of freight. Utility employees are defined as railroad employees who are temporarily part of a train or yard crew to help the crew assemble, disassemble, or classify rail cars or operate trains. 49 C.F.R. § 218.5. "As part of their overall duties, utility employees will provide assistance to train crews in switching service as needed." Declaration of Jamie Modesitt, see Exhibit C ¶ 13. Utility employees serve a variety of functions and work with different train crews throughout a shift. *Id*.

      **C.**      **Ohio's Crew Size Law has no application to helper service, remote control operations, or switching service.**

Helper service occurs when an engine is unable to pull a train, usually due to a mechanical failure or extreme grade conditions, and an additional engine is employed to travel to

6

the disabled train and couple with said train to assist the movement. Modesitt Declaration, Exhibit C ¶ 12. The helper service, when connected to the train, consists of at least two engineers and one conductor. Wallace Declaration, Exhibit B ¶ 13.

A remote-control operator (RCO) uses a handheld operator control unit to operate a remote-control locomotive from the ground with no engineer on board the engine as part of the crew to move a train as necessary. Modesitt Declaration, Exhibit C ¶ 8. An RCO crew may consist of one or more conductors. *Id.* RCO operations solely exist within rail yards and extend to so-called "terminal limits", which establish the geographical limit of a yard. *Id*. at ¶ 9. RCO operations in yards are employed in "switching" service. *Id*. at ¶ 10. Switching service is the process of putting cars in a specific order (as in a classification yard), placing cars for loading or retrieving empties (industrial switching), or the process of adding or removing cars from a train at an intermediate point, or the movement of cars from one point to another within the limits of an individual plant, industrial area, or a rail yard. The RCO operator will control the engine remotely to move cars to and from different tracks for train assembly solely within a yard. *Id*. Other RCO operations may involve traveling to an industry, i.e. a customer, within the terminal limits of the yard to pick up and drop off cars, and perform switching at the industry. *Id*. at ¶ 11. Declarant Modesitt is unaware of any instances where fewer than two conductors are used to perform such service. *Id*.

The FRA recently clarified in its latest notice of proposed rulemaking on train crew size that a "train" does not include switching operations/service. 87 Fed. Reg. 45,586. "Train means one or more locomotives coupled with one or more freight cars, except during switching service." 49 C.F.R. §§ 232.5 and 238.5 for similar train definition. Also see definition of switching service in the federal regulations at 49 C.F.R. § 229.5.

7

Based on this evidence, AAR cannot show concrete and particularized injury-in-fact to establish Article III standing to bring it claims against the Defendants regarding Ohio's Crew Size Law.

## II. PLAINTIFFS' COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF.

A plain reading and comparison of the 3R Act (Complaint ¶3) and the Crew Size Law facially shows no conflict between them. The 3R Act prohibits a state from having a law requiring a railroad to employ any specified number of persons to perform any particular task, function, or operation. The Crew Size Law clearly does not have that requirement. Instead, the Crew Size Law requires two individuals on a train when moving freight. The Crew Size Law has no requirements as to a specific number of particular crew job titles or classifications; no particular task requirements for members; or specific number of employees performing any particular function or operation on the train. A crew member not at the controls of the train is not operating the train. "Locomotive cab means the compartment or space on board a locomotive where the control stand is located and which is normally occupied by the engineer when the locomotive is operated." 49 C.F.R. § 238.5 "Locomotive, controlling means the locomotive from which the locomotive engineer exercises control over the train." *Id*. A conductor does not operate (start, stop, secure, control, or move) the train because that job is always under the control of the engineer. The Crew Size Law has no requirement as to the number of engineers on a train (more than 1 like 2 or 3) or conductors (more than 1 like 2 or 3). The standard operating practice today in the industry on mainlines is one engineer and one conductor. Two individuals on a moving freight train is all that is required by the Crew Size Law.

Finally, Congressional legislative history reveals that on October 16, 2008, Congress ordered the Secretary of U.S. Department of Transportation (USDOT) to complete a study of the

8

impacts of repealing 45 U.S.C. § 797j. See Public Law 110-432, 110th Congress Sec. 408 of the Rail Safety Improvement Act (RSIA) as Exhibit D attached. On May 26, 2011, Secretary Ray LaHood submitted his Report to Congress concerning USDOT's findings, conclusions, and recommendations. See attached Exhibit D attached. The Report provides a detailed history of the purpose and objectives of the 3R Act. *Id*. On page 4 of the Report is an explanatory statement of the House and Senate Conferees, published in 1981, on what the 3R Act preempted. *Id.* The explanatory statement provides, in-part, "Section 711 preempts any State law***requiring Conrail***to hire specified numbers of persons for particular tasks." *Id*. This legislative history is consistent and supports the Defendants' plain reading, meaning, and application of the 3R Act. Ohio's Crew Size Law contains no such requirement to hire a specified number of persons to be employed in certain positions and perform particular tasks. Furthermore, Ohio regulatory history provides that prior to the passage of the 3R Act, Ohio required a full train crew, consisting of five persons; one engineer, one fireman, one conductor, and two brakemen sent out on main track. See attached Exhibit E containing H.B. 325 (1902) and S.B. 28 (1919) (Ohio Historical Acts). Defendants submit that Ohio's laws on particular train crew members in Exhibit E is what the 3R Act was intended to preempt; not Ohio's current Crew Size Law of two individuals.

**III.     OHIO'S CREW SIZE LAW IS NOT PREEMPTED BY THE 3R ACT**

Congress passed the 3R Act in 1974 to address a railway crisis in the Northeast and Midwest. *Blanchette v. Connecticut General Ins. Corps.*, 419 U.S. 102, 108-09 (1974). The 3R Act was designed to reorganize the railroads in those regions, bringing them under the control of a new government corporation that would create a plan to turn them into an "economically viable railway system." *Id.* at 109-17; 45 U.S.C. § 701(b)(2). That "Region" was defined to include 17

9

states, including Ohio, as well as the District of Columbia and some "portions of contiguous States." 45 U.S.C. § 702(17). The 3R Act includes the following clause:

> No State may adopt or continue in force any law, rule, regulation, order, or standard requiring the Corporation *to employ any specified number of persons to perform any particular task, function, or operation*, ... and no State in the Region may adopt or continue in force any such law, rule, regulation, order, or standard with respect to any railroad in the Region.

45 U.S.C. § 797j (emphasis added). The AAR in this case contends that Ohio, as a "State in the Region" covered by the 3R Act, is prohibited under Section 797j from adopting a law that mandates a specific crew size.

The 3R Act was passed to assist "eight major railroads in the Northeast and Midwest [regions] of the country [that had] entered reorganization under §77 of the Bankruptcy Act, 11 U.S.C. §205." *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 108 (1974). The 3R Act created Consolidated Rail Corporation ("Conrail") to assume ownership of the bankrupt railroads. *Id.* at 109-111.

The purpose of Section 711 was to facilitate the plan to enable the return of Conrail to private ownership and not to economically disadvantage other railroads in states "in the Region" where Conrail would be operating in the process. As the Special Court established under the 3R Act explained:

> the primary purpose behind federal regulation of crew sizes is to promote the continued economic viability of the railroads through the elimination of excess employees. Neither the Rail Act nor NRSA addresses safety concerns, [so] where the state regulation is solely related to safety, and the Secretary of Transportation has not acted, section 711 of the Rail Act and section 1168(b) of NRSA will not preempt a state statute that requires a minimum crew complement on trains.

*Norfolk & Western Ry. Co. v. Public Service Commission of West Virginia,* 858 F. Supp. 1213, 1217 (Regional Rail Reorg. Ct. 1994). The Crew Size Law here is different

10

than the West Virginia law requiring two men crew for helper service that was struck down for not meeting the sole safety purpose standard. The sole expressed purpose of Ohio's Crew Size Law is safety and does not apply to helper service.

There can be little doubt that safety was the motivating factor underlying the adoption of Ohio's Crew Size Law. The statute itself expressly states that it is solely related to safety. There was plenty of testimony in support of H.B. 23 that became Ohio's Crew Size Law. For example, see the attached Declaration of John Esterly who testified and provided safety reasons in support of Ohio's Crew Size Law. Exhibit F attached. Included in his testimony addressing railroad safety is a discussion of how vital the second member of the crew-the conductor-is to the safety of the movement of railroad freight in Ohio. *Id.* at ¶ 6. The conductor is the "first" first responder, able to quickly assess the situation and provide information and guidance to police and fire fighters when they arrive. *Id*.

At the time of the enactment of the 3R Act, Congress was faced with a problem it considered extraordinary: the economic failure of the freight railroad industry *en masse* in certain sectors of the country. But the conditions that originally justified Section 711, at least in Ohio, one of the covered jurisdictions, no longer exists.

In *Brotherhood of Locomotive Firemen & Enginemen v. Chicago, R.I. & P.R. Co*., 393 U.S. 129 (1968), the question raised was whether the Arkansas "full-crew" laws, specifying a minimum number of employees who must serve as part of a train crew under certain circumstances, violated the Commerce Clause or the Fourteenth Amendment. The Court held: "[w]hether full-crew laws are necessary to further railroad safety is a matter for legislative determination. In the circumstances of this case the District Court erred in rejecting the legislative judgment that such laws promote railroad safety and that the cost of

11

additional crewmen is justified by the safety such laws might achieve." *Id.* at 136-140.

As demonstrated above, Ohio's Crew Size Law is solely related to safety and does not cause any economic harm or injury to AAR's members. Economic vitality of railroads and returning Conrail to private ownership does not supersede States acting to require minimum train crews for public safety reasons. The 3R Act, passed by Congress under its Commerce Clause authority, does not preempt Ohio's Crew Size Law, which was passed by Ohio's Legislature under its Police Powers.

## IV. THE 3R *ACT* IS UNCONSTITUTIONAL FOR VIOLATING THE EQUAL SOVEREIGNTY DOCTRINE OF THE U.S. CONSTITUTION AMENDMENT 10.

Supreme Court precedent confirms that the equal-sovereignty principle limits Congress's power to unequally burden the States' sovereign authority.

The U.S. Supreme Court decided that Section 4(b) of the Voting Rights Act of 1965 was unconstitutional based on the Equal Sovereignty Doctrine in *Shelby County, Ala. v. Holder*, 570 U.S. 529 (2013). As the Court explained there:

> The Voting Rights Act of 1965 employed extraordinary measures to address an extraordinary problem…Nearly 50 years later, they are still in effect; indeed, they have been made more stringent, and are now scheduled to last until 2031. There is no denying, however, that the conditions that originally justified these measures no longer characterize voting in the covered jurisdictions.

*Id*. at 531. The same is true with the 3R Act. In 1974, Congress was faced with a problem it considered extraordinary: the economic failure of the freight railroad industry. The solution was to create Conrail, a railroad no longer operating in Ohio or in the region of 17 states covered by the 3R Act. Thus, the conditions that originally justified Section 711, at least in Ohio, one of the covered jurisdictions, no longer exists.

The U.S. Supreme Court first expressed serious doubts about the Act's continued constitutionality in *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U.S. 193

12

(2009). Subsequently, Shelby County, in the covered jurisdiction of Alabama (Section 4 of Act covered 9 states), sued seeking a declaratory judgment that § 4(b) and §5 were facially unconstitutional, as well as a permanent injunction against their enforcement. The U.S. Supreme Court held that Section 4 of the Voting Rights Act was unconstitutional and that its formula could no longer be used as a basis for subjecting jurisdictions to preclearance. *Shelby County*, at 556.

> In the Shelby County decision, the U.S. Supreme Court stated:
>
> In *Northwest Austin*, we stated that "the Act imposes current burdens and must be justified by current needs." 557 U.S., at 203, 129 S. Ct. 2504, 174 L. Ed. 2d 140. And we concluded that "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Ibid*. These basic principles guide our review of the question before us.

*Id*. at 542.

Since 1974, nearly 50 years later, things have changed dramatically in the railroad freight industry. As the U.S. Supreme Court explained, a statute's "current burdens" must be justified by "current needs," and any "disparate geographic coverage" must be "sufficiently related to the problem that it targets." *Id.* at 547.

In this case, the Court should find that the equal sovereignty principle limits Congress's ability to continue to apply the 3R Act that subjects different States to unequal burdens, at least without sufficient justification. The current burdens continue without relation to the problem that existed 50 years ago. The economic situation the railroads had experienced back in the 1970's no longer exist today. In 2011, the Secretary of USDOT recommended to Congress that "[t]he statutory purpose for which Section 711 was originally enacted has clearly been satisfied." Exhibit D (Report at 5). Further, the Secretary stated: "The primacy of Federal law over state law in this area existed in order to serve a narrow and specifically defined purpose: the privatization

13

of Conrail. That purpose has been met***". *Id*. No railroad company today is threatening or in bankruptcy. In fact, CSX and NS are recording record profits in 2022. See financial statement of CSX.[6] Also, see financial statement of NS[7]. Things have changed dramatically, as shown from the financial statements of CSX and NS. As a result, and in contrast to the "exceptional conditions" presented back in 1974, current conditions do not justify applying the 3R Act to the 17 states, including Ohio, for the protection of railroads from bankruptcy.

The equal sovereignty doctrine is not limited in application to the Voting Rights Act. It also applies here. "In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic, Inc*. v. *Lohr*, 518 U.S. 470, 485 (1996): quoting *Rice* v. *Santa Fe Elevator Corp*., 331 U.S. 218, 230 (1947). Congress did not make clear that the manifest purpose of the 3R Act was to supersede the legislative process of States exercising their police and public safety powers to protect its communities from derailments, intersections from being blocked, and collisions with motorists at crossings.

Even after Congress began regulating railroads, grade crossings remained an area "within the police power of the States." *Lehigh Valley R. Co. v. Bd. of Pub. Util. Comm'rs*, 278 U.S. 24, 35 (1928). According to this Court, the public's interest in using the streets is a "more important interest" than the railroads' interest in using grade crossings, and regulations pertaining to grade

---

[6] https://www.sec.gov/ix?doc=/Archives/edgar/data/277948/000027794823000006/csx-20221231.htm#i40071d158dbf4c538fc6bcfb987a65d1_43
[7] https://www.sec.gov/ix?doc=/Archives/edgar/data/0000702165/000070216523000010/nsc-20221231.htm

14

crossings "obvious[ly]" implicate the States' traditional "police power." *Erie R. Co. v. Bd. of Pub. Util. Comm'rs*, 254 U.S. 394, 410 (1921).

For these reasons, the AAR's 3R Act preemption claim must be dismissed and the Act should be declared unconstitutional as the Act's disparate treatment and burdens are no longer justified; the 3R Act violates the equal sovereignty doctrine and interferes with Ohio's police powers.

## V. THE FRSA HAS NOT PRESCRIBED A RULE ON TRAIN CREW SIZE

The Crew Size Law, R.C. 4999.09, is not preempted by the Federal Railroad Safety Act (FRSA) under 49 U.S.C. § 20106. The FRSA contains a savings clause that expressly allows a State to "adopt or continue in force a law, regulation, or order related to railroad safety... until the Secretary of Transportation... prescribes a regulation or issues an order covering the subject matter of the State requirement." *Id.* at 20106(a)(2).

A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order:

> (A) is necessary to eliminate or reduce an essentially local safety or security hazard;
>
> (B) is not incompatible with a law, regulation, or order of the United States Government; and
>
> (C) does not unreasonably burden interstate commerce.

*Id.*

Unpacking this language, the savings clause creates two safe harbors through which States may enforce laws "related to railroad safety." *Id.*

Safe harbor 1: States may regulate matters related to railroad safety as they see fit until the Secretary promulgates a regulation that "cover[s] the subject-matter" in question. *Id.*

15

Safe harbor 2: Even when the Secretary has covered a subject, States may "continue in force an additional or more stringent law" if it is:(1) "necessary to eliminate or reduce an essentially local safety … hazard"; (2) compatible with federal law; and (3) not unreasonably burdensome. *Id.*

As conceded by the Plaintiffs in this case, see ¶ 61 of Complaint, the "FRA has not yet finalized its proposed train crew staffing rule." Also, see Modesitt Declaration attached as Exhibit C ¶ 7.

For these reasons, Defendants' motion for summary judgment should be granted.

## VI. OHIO'S CREW SIZE LAW IS NOT PREEMPTED BY THE TERMINATION ACT

The Interstate Commerce Commission Termination Act of 1995 (Termination Act). Pub. L. No. 104-88, 109 Stat. 803 (Dec. 29, 1995) granted exclusive authority to the Surface Transportation Board (STB) over "transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers." 49 U.S.C. § 10501(b). It did little, however, to explain how the "exclusive" authority interacts with that of other state or federal government entities. If the grant of "exclusive" jurisdiction to the Board gave the Board sole authority to regulate *all* railroad matters—safety-related and otherwise—neither the Federal Railroad Administration nor the States would regulate those matters. Accordingly, the Federal Railroad Administration and the States have continued to adopt safety-related regulations pertaining to the railroad industry.

For laws "related to railroad safety," §20106(a)(2), the FRSA provides the answer on preemption—one way or another. There is no role for the Termination Act to play.

The Termination Act includes nothing about the safety of rail transportation, nor about

16

any regulation of employee staffing within the rail industry. The Termination Act is limited to economic and financial issues involving railroads and grants no jurisdiction over safety to the STB.

Federal regulation of rail safety issues rests exclusively with the FRA pursuant to the FRSA. When Congress enacted the FRSA, it allowed states to adopt and maintain safety laws to govern areas where the FRA had not yet issued rules or regulations.

Since it came into being in 1996, the STB has not issued any railroad safety regulations. By contrast, the FRA and states continue to issue numerous rail safety regulations, covering a broad range of safety issues many of which have an economic impact on the railroads.

Moreover, the STB and the FRA have both rejected the argument that the Termination Act preempts state laws regarding railroad safety. For example, each agency filed an *amicus* brief in *Tyrrell v. Norfolk Southern Ry.,* 248 F.3d 517 (6th Cir. 2001), arguing that the FRSA, not the Termination Act, is the appropriate statute to determine whether state safety rules are preempted. In that case, the Court of Appeals agreed with both agencies that the Termination Act did not apply.

The Court explained:

> While the STB must adhere to federal policies encouraging "safe and suitable working conditions in the railroad industry," the ICCTA and its legislative history contain no evidence that Congress intended for the STB to supplant the FRA's authority over rail safety. 49 U.S.C. § 10101(11).

*Id.* at 523. The Court held the Ohio regulation had a "connection with rail safety based on its terms, the safety benefits of compliance, and its legally recognized purpose, FRSA provides the applicable standard for assessing federal preemption." *Id.* at 524. That same legal analysis applies here.

17

Because Ohio's Crew Size Law would have, at best, an incidental effect upon the movement of trains (and Plaintiff has not shown that it will have any effect at all), it cannot be categorically preempted. *Norfolk So. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 157 (4th Cir. 2010) ("Congress has narrowly tailored the ICCTA preemption provision to displace only regulation, i.e., those state laws that may reasonably be said to have the effect of managing or governing rail transportation." (internal quotations omitted)).

> The Sixth Circuit follows the Board's test for determining whether and the extent to which the Act preempts State remedies. *Id.* (quoting *New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 332 (5th Cir. 2008)). State remedies are permissible so long as (1) the remedies are not unreasonably burdensome, and (2) the remedies do not discriminate against railroads. *Id.* at 541 (citations omitted). The touchstone of the analysis "is whether the state regulation imposes an unreasonable burden on railroading." *Id.* (quoting *New York Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 253 (3rd Cir. 2007)).

*Norfolk S. Ry. Co. v. Dille Rd. Recycling, LLC*, 2022 U.S. Dist. LEXIS 220248, __ F.Supp.3d. __ (N.D. Ohio 2022). As demonstrated within, Plaintiff has demonstrated no harm, no injury, let alone any "unreasonable burden on railroading."

Plaintiff has proffered no evidence showing that Ohio's Crew Size Law unreasonably interferes with or prevents railroad transportation. A number of States regulate train crew size and yet the freight industry continues to function. *See, e.g.*, Ariz. Rev. Stat. Ann. § 40-881; Cal. Lab. Code § 6903(a); Colo. Rev. Stat. Ann. § 40-9-110; Mass. Gen. Laws Ann. ch. 160, § 185; N.J. Stat. Ann. § 48:12-155; N.R.S. AB 337 (effective Oct. 1, 2019); Or. Rev. Stat. Ann. § 824.30; Wash. Rev. Code Ann. § 81.40.010(a); W. Va. Code Ann. § 24-3-1b(a); Wis. Stat. Ann. § 192.25(2).

In sum, this Court should grant Defendants' motion for summary judgment on the Termination Act preemption claim because that law is inapplicable and, alternatively, because

Plaintiff has failed to satisfy its burden. The Termination Act simply does not apply to this situation.

## CONCLUSION

For the foregoing reasons, Defendant Commissioners' Motion for Summary Judgment should be granted.

Dated: September 25, 2023

Respectfully submitted,

**Dave Yost**
Ohio Attorney General

**John Jones**
Section Chief

*/s/ Werner L. Margard III*
**Werner L. Margard III** (0024858)
**Amy Botschner O'Brien** (0074423)
Assistant Attorneys General
Public Utilities Section
30 East Broad Street, 26th Floor
Columbus, OH 43215
(614) 466-4397
FAX: (614) 644-8764
Werner.Margard@OhioAGO.gov
Amy.BotschnerOBrien@OhioAGO.gov

**On Behalf of Defendants Jenifer French, Daniel R. Conway, Dennis P. Deters, Lawrence K. Friedeman, and John D. Williams**

**CERTIFICATE OF SERVICE**

      I hereby certify that on September 25, 2023, the foregoing was filed with the Court. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties for whom counsel has entered an appearance. Parties may access this filing through the Court's system.

                                                            */s/ Werner L. Margard III*
                                                            **Werner L. Margard III** (0024858)
                                                            Assistant Attorney General