**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS, <br><br> Plaintiff, <br><br> v. <br><br> DAVE YOST, *Ohio Attorney General*, *et al.*, <br><br> Defendants. | Case No. 2:23-cv-2096 <br><br> Judge Michael H. Watson <br><br> Magistrate Judge Kimberly A. Jolson <br><br> **ORAL ARGUMENT REQUESTED** |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Congress has exercised broad regulatory authority over rail transportation for well over a century.  During that time, Congress and federal regulatory agencies, including the Federal Railroad Administration ("FRA") and the Surface Transportation Board ("STB"), have declined to impose minimum train crew sizes on railroads.  Rather, crew size has been established on each railroad through collective bargaining.

Federal law expressly prohibits Ohio from establishing a minimum crew size.  In 1973, Congress enacted the Regional Rail Reorganization Act ("3R Act") to address a railway crisis in the Northeast and Midwest.  Section 711 of the 3R Act provides that:

> No State may adopt or continue in force any law, rule, regulation, order, or standard requiring the Corporation [Conrail] to employ any specified number of persons to perform any particular task, function, or operation, or requiring the Corporation to pay protective benefits to employees, and *no State in the Region may adopt or continue in force any such law, rule, regulation, order, or standard with respect to any railroad in the Region.*

45 U.S.C. § 797j (emphasis added).  Ohio is a "State in the Region."  *See id.* § 702(17), (19).  As a result, the plain text of the 3R Act prohibits Ohio from adopting any law requiring any railroad in the State to employ any specified number of persons to perform any particular task, function, or operation.

1

Nonetheless, in March 2023, Ohio enacted Ohio Rev. Code § 4999.09 (the "Crew Size Law"), which requires that all freight railroads operate in almost all circumstances with at least two crew members. Specifically, the Crew Size Law mandates that "[a] train or light engine used in connection with the movement of freight shall have a crew that consists of at least two individuals," with exceptions only for "hostler service or utility employees." *Id.* § 4999.09(B).

That mandate cannot be squared with the 3R Act. As the U.S. District Court for the Northern District of Illinois concluded two years ago in striking down Illinois' virtually identical crew size law, the 3R Act "defined a region that includes Illinois, and set out certain restrictions on how states in that region can regulate railroads. Illinois must abide by those restrictions, and in passing the Crew Size Law, it failed to do so." *Ind. R.R. Co. v. Ill. Com. Comm'n*, 576 F. Supp. 3d 571, 575 (N.D. Ill. 2021). Like Illinois, Ohio "wants to mandate a crew size of two to perform the task, function or operation of moving freight with a train or light engine; this is *exactly* what the 3R Act prohibits." *Id.* at 576 (emphasis added).

Because the 3R Act resolves this case, the Court can grant summary judgment to AAR without reaching any of the other claims. *See Ind. R.R. Co.*, 576 F. Supp. 3d at 575. If the Court is inclined to reach those claims, it should hold that the Crew Size Law is inconsistent with the preemption provisions in other federal laws regulating railroads. The ICC Termination Act ("ICCTA"), 49 U.S.C. § 10501(b), grants the STB "exclusive" jurisdiction "with respect to regulation of rail transportation." And FRA's determination that no crew size regulation is necessary or appropriate for remote control operations preempts the Crew Size Law under the Federal Railroad Safety Act ("FRSA") to the extent that the Law governs such operations. *See*, *e.g.*, *Norfolk & W. Ry. Co. v. Pub. Utils. Comm'n of Ohio*, 926 F.2d 567, 570 (6th Cir. 1991).

2

AAR is entitled to summary judgment on each of these claims because there are no material facts in dispute and the Crew Size Law cannot stand as a matter of law. This Court should hear oral argument given the importance of the constitutional issues presented by this case. *See* S.D. Ohio Civ. R. 7.1(b).

## BACKGROUND

"[T]echnology has enabled a gradual reduction in the number of train crewmembers from about five in the 1960s to about two by the end of the 1990s." FRA, *Train Crew Size Safety Requirements*, 87 Fed. Reg. 45,564, 45,567 (July 28, 2022) (notice of proposed rulemaking ("NPRM")). Among the "major technological breakthroughs" that enabled reduced crew sizes were the advent of diesel locomotives, which eliminated the need for firemen, and "end-of-train device[s]," which removed the need for a caboose and "one or more crewmembers to be at the rear of a train." *Id.*

Throughout this time, "crew size has been an issue for labor relations"—that is, debates over crew size have historically been resolved through collective bargaining between railroads and unions rather than under the guise of safety regulation. FRA, *Train Crew Staffing*, 81 Fed. Reg. 13,918, 13,937 (Mar. 15, 2016).

### A. Congress Prohibits Ohio From Regulating Crew Size.

Congress has expressly prohibited Ohio from regulating minimum crew size. In 1974, Congress passed the 3R Act to address a railway crisis in the Northeast and Midwest. The 3R Act was designed to reorganize the railroads in those regions, bringing them under the control of a new government corporation—Conrail—that would create a plan to turn them into a single, economically viable railway system. *See Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 109–17 (1974); 45 U.S.C. § 701(b)(2). The 3R Act included prescriptions specific to the region

3

most affected by the railway crisis:  A "Region" defined to include Ohio, 16 other states, and the District of Columbia.  45 U.S.C. § 702(17).

One of those prescriptions, added by the Northeast Railroad Service Act of 1981, expressly states that "no State in the Region may adopt" any "law" requiring "any railroad in the Region" to "employ any specified number of persons to perform any particular task, function, or operation."  45 U.S.C. § 797j.  "The legislative goal was to give Conrail"—the federally created successor to numerous bankrupt rail carriers—"the opportunity to become profitable, but not necessarily to disadvantage all other railroads at the same time."  *Norfolk & W. Ry. Co. v. Pub. Utils. Comm'n of Ohio*, 582 F. Supp. 1552, 1556 (Reg'l Rail Reorg. Ct. 1984).  Thus, Congress extended the 3R Act's preemption provision not just to Conrail and its successors, but to *all* railroads in the specified area.  *See id.*

Although several "State[s] in the Region" have attempted to require minimum crew sizes notwithstanding the 3R Act's express preemption clause, every court to consider the issue has held that such laws are preempted under the 3R Act.  *See*, *e.g.*, *Ind. R.R. Co.*, 576 F. Supp. 3d 571; *Norfolk & W. Ry. Co. v. Pub. Serv. Comm'n of W. Va.*, 858 F. Supp. 1213, 1217 (Reg'l Rail Reorg. Ct. 1994) (West Virginia minimum crew size law preempted); *Keeler v. Consol. Rail Corp.*, 582 F. Supp. 1546, 1550 (Reg'l Rail Reorg. Ct. 1984) (Indiana minimum crew size law preempted).

B.    **FRA Concludes That Minimum Crew Size Regulation Is Not Appropriate In Certain Circumstances.**

At the federal level, FRA has historically declined to regulate minimum crew size but instead recognized that railroads may operate with a single crew member in a variety of circumstances.  For example, FRA has issued extensive regulations governing remote control operations.  *See* 49 C.F.R. § 229.15 (2012).  These regulations expressly contemplate and permit

4

one-person crews in various contexts.  *Id.*  In 2001, FRA issued a safety advisory recognizing

that remote control locomotives—that is, a "locomotive which, through use of a radio transmitter

and receiver system, can be operated by a person not physically located at the controls within the

confines of the locomotive cab"—had "been in use for a number of years."  FRA, *Notice of*

*Safety Advisory 2001-01*, 66 Fed. Reg. 10,340, 10,340 (Feb. 14, 2001).  FRA issued guidance for

conducting such one-person operations, while expressly declining to prohibit them.  *See id.* at

10,343.

In 2009, FRA denied a petition from a labor union to prohibit one-person operating

crews, including for remote control locomotive operations.  *See* FRA, *Denial of BLET Petition*

*on RCO and Other Single-Person Operations* (Nov. 10, 2009), Ex. 1 to Declaration of Jacob T.

Spencer (Exhibit A).  FRA explained that it had "no factual evidence to support the prohibition

against one-person crew operations."  *Id.* at 1.

Recently, FRA issued an NPRM that would generally require FRA approval before

railroads transition to operations with fewer than two crew members.  *See Train Crew Size Safety*

*Requirements*, 87 Fed. Reg. at 45,564.  At the same time, FRA recognized that one-person crews

have been used for decades in specific circumstances.  For example, "over the last 25 years,

remotely controlled locomotive operations utilizing only a one-person crew for switching service

have become commonplace."  *Id.* at 45,567.  And it noted that several short line railroads have

used one-person crews for over-the-road operations safely for many years.  *See id.* at 45,568.

In the NPRM, FRA proposed to exempt remote control operations and certain small

railroads from any crew size mandate.  *See* 87 Fed. Reg. at 45,618.  And it proposed a special

approval process for continuance of legacy train operations staffed with a one-person crew.  *See*

*id.*  FRA has not yet finalized its proposed crew size rule.  If and when FRA issues a final rule, it

5

will preempt the entire Crew Size Law under FRSA, and the Law will cease to be effective under its own sunset provision. *See* Ohio Rev. Code § 4999.09(D) ("The requirements of this section do not apply on and after the date a federal law or regulation takes effect requiring a train or light engine used in connection with the movement of freight in this state to have a crew of at least two individuals.").

### C.    Ohio Enacts The Crew Size Law.

On March 31, 2023, Governor DeWine signed the Crew Size Law, codified at Ohio Rev. Code § 4999.09, into law. It provides that "[a] train or light engine used in connection with the movement of freight shall have a crew that consists of at least two individuals" and states that "[n]o superintendent, trainmaster, or other employee of a railroad shall order or otherwise require a train or light engine used in connection with the movement of freight to be operated unless it has a crew that consists of at least two individuals." Ohio Rev. Code § 4999.09(B). The Crew Size Law applies to every train or light engine used in connection with the movement of freight, except for "hostler service or utility employees." *Id.*

Defendant Jenifer French is the Chair, and Defendants Daniel R. Conway, Dennis P. Deters, Lawrence K. Friedeman, and John Williams are Commissioners, of the Ohio Public Utilities Commission. The Commission is authorized to "assess a civil penalty against a person who willfully violates" the Crew Size Law's requirements. Ohio Rev. Code § 4999.09(C)(1). Those penalties can range from $250 to $10,000. *Id.* § 4999.09(C)(1)(a)–(c).

### D.    One-Person Crews Have Operated Safely For Many Years.

Railroads in the United States and elsewhere have safely used one-person crews in a wide variety of operating contexts for many years. For example, as "remotely controlled locomotive operations" have become widespread over the last 25 years, "utilizing only a one-person crew for switching service ha[s] become commonplace." 87 Fed. Reg. at 45,567. In 2016, FRA

acknowledged not only that existing one-person operations "have not yet raised serious safety concerns," 81 Fed. Reg. at 13,950, but also that "it is possible that one-person crews have *contributed* to the [industry's] improving safety record," *id.* at 13,932 (emphasis added); *see also* Oliver Wyman, *Analysis of North American Freight Rail Single-Person Crews: Safety and Economics* (Feb. 3, 2015), AAR Comments Ex. 3, FRA Docket No. FRA-2021-0032 (concluding, based on accident data, that single-person train crew operations are just as safe as multiple-person operations), *available at* regulations.gov/comment/FRA-2021-0032-13056; FRA, *Train Crew Staffing, Notice of Proposed Rulemaking, Regulatory Impact Analysis* at 21 (Feb. 18, 2016) (reporting that in the United Kingdom, where one-person freight operations are common, the Rail Safety and Standards Board found that "one-person crews were at least as safe as multiple crew operations"), *available at* regulations.gov/document/FRA-2014-0033-0002.

Class I railroads use one-person crews for certain operations in Ohio. *See* Declaration of Rodney Brown ("Brown Decl.") (Exhibit B), ¶ 6; Declaration of Kraig J. Barner ("Barner Decl.") (Exhibit C), ¶ 6. And although the Class I railroads typically do not use one-person crews for mainline operations at this time, many short line railroads in the United States operate with one-person crews. Indeed, one such short line—Indiana Railroad Company ("INRD"), which is a 250-mile regional railroad operating in Indiana and Illinois—was highlighted by FRA as having safe operations. 87 Fed. Reg. at 45,568. Since 1997, it has been safely and effectively operating with one-person crews. In 2021, INRD utilized one-person operations on about 31 train starts per week. The implementation of one-person operations at INRD was the result of research, innovation, and the use of new technology. Statement of Dewayne Swindall ("Swindall Statement") (Dec. 8, 2022), AAR Comments Ex. 8, FRA Docket No. FRA-2021-0032, *available at* regulations.gov/comment/FRA-2021-0032-13056.

INRD's evidence and data—collected over more than two decades—establishes that one-person crews are just as safe as two-person crews.  INRD has had only one FRA-reportable human factor incident involving a one-person crew in 25 years of one-person operations.  Of the non-FRA-reportable human factor incidents, while one-person crew operations were 18.3% of INRD man-hours from 2006 through July 2022, they only accounted for 5.9% of human factor incidents.  In comparison, two-person crews were 81.7% of INRD man-hours, but accounted for 94.1% of human factor incidents.  Swindall Statement, at 5–6.

## ARGUMENT

AAR is entitled to summary judgment because, as a matter of law, the Crew Size Law is preempted in full under the 3R Act and ICCTA, and in part under FRSA.  Here, there are no genuine disputes as to any material fact; the parties agree that these claims "present questions of law that can be resolved through cross-motions for summary judgment."  Joint 26(f) Report, ECF No. 23, PageID # 165.  Each of these grounds provides a separate and independent reason to grant summary judgment in full or in part to AAR.

For the same reasons, AAR is also entitled to summary judgment on the Commissioners' affirmative defenses going to the merits.  *See* Answer, ECF No. 21, PageID # 158–59, ¶¶ 2, 3.  AAR is also entitled to summary judgment on the Commissioners' Eleventh Amendment defense, *id.* at PageID # 158, ¶ 1, because that Amendment does not bar suits for declaratory and injunctive relief against "individual commissioners in their official capacities," *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).  And AAR is entitled to summary judgment on the Commissioners' standing defense, Answer, ECF No. 21, PageID # 159–61, ¶ 4, because the Crew Size Law restricts AAR's members' current conduct and requires them to comply with its mandate, even though that mandate is preempted by federal law.

I. **AAR Is Entitled To Summary Judgment On Each Of Its Claims.**

A. **The Crew Size Law Is Preempted By The 3R Act.**

AAR is entitled to judgment as a matter of law because the Crew Size Law conflicts with and is expressly preempted by Section 711 of the 3R Act, as amended by Section 1143(a) of the Northeast Rail Service Act, 45 U.S.C. § 797j.  "[B]ecause the statute contains an express pre-emption clause," the Court should not "invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent."  *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation and quotation marks omitted); *see also R.R. Ventures, Inc. v. STB*, 299 F.3d 523, 562 (6th Cir. 2002) (Any presumption against preemption is "'not triggered when the State regulates in an area where there has been a history of significant federal presence.'" (quoting *United States v. Locke*, 529 U.S. 89, 108 (2000))).

Resolving whether the 3R Act preempts the Crew Size Law thus "begins with the language of the statute itself, and that is also where the inquiry should end, for the statute's language is plain."  *Puerto Rico*, 579 U.S. at 125 (quotation marks omitted).  As amended, Section 711 of the 3R Act provides that:

> No state may adopt or continue in force any law, rule, regulation, order, or standard requiring the Corporation [Conrail] to employ any specified number of persons to perform any particular task, function, or operation, or requiring the Corporation to pay protective benefits to employees, and *no State in the Region may adopt or continue in force any such law, rule, regulation, order, or standard with respect to any railroad in the Region.*

45 U.S.C. § 797j (emphasis added).  Ohio is a "State in the Region" as defined by Section 102 of the 3R Act.  *See id.* § 702(17), (19).  And railroads that operate in Ohio are "railroad[s] in the Region" under Section 711 of the 3R Act.  *See id.* § 702(15), (17).

9

The Crew Size Law directly conflicts with this express preemption provision.  The Law specifies that "at least two individuals" *must* be used to operate any freight train or light engine other than "hostler service or utility employees."  Ohio Rev. Code § 4999.09(B).  It is indisputably a "law" requiring a "specified number of persons to perform any particular task, function, or operation."  45 U.S.C. § 797j.  Thus, it is preempted under the plain text of the 3R Act, like many other previous attempts by "State[s] in the Region" to regulate minimum crew size.  *See*, *e.g.*, *Norfolk & W. Ry.*, 858 F. Supp. at 1214 (West Virginia crew size statute preempted); *Boettjer v. Chesapeake & Ohio Ry. Co.*, 612 F. Supp. 1207, 1209 (Reg'l Rail Reorg. Ct. 1985) (Indiana crew size statute preempted); *Keeler*, 582 F. Supp. at 1550 (same).

Two years ago, the Northern District of Illinois reached exactly that conclusion with respect to Illinois' minimum crew size law.  *See Ind. R.R. Co.*, 576 F. Supp. 3d 571.  Like Ohio's Crew Size Law, Illinois' law provided that "[n]o rail carrier shall operate or cause to operate a train or light engine used in connection with the movement of freight unless it has an operating crew of at least 2 individuals."  *Id.* at 573.  Illinois "want[ed] to mandate a crew size of two to perform the task, function or operation of moving freight with a train or light engine."  *Id.* at 576.  But that "is exactly what the 3R Act prohibits," using language that "is too specific to ignore."  *Id.* at 575–76.  The court thus granted summary judgment for AAR.  *Id.* at 577–78.  This Court should do the same.

It makes no difference that the Crew Size Law's requirements are purportedly "solely related to safety."  Ohio Rev. Code § 4999.09(A).  Illinois attempted to defend its law on that basis, arguing that the 3R Act does not preempt state crew size laws "concerned exclusively with safety."  *Ind. R.R. Co.*, 576 F. Supp. 3d at 576.  But the court flatly rejected that interpretation, "given the plain language of the statute": The 3R Act may not be "*generally* concerned with

safety matters.  But on the *specific* issue of crew sizes, the statute is clear."  *Id.*  at 576–77.  In short, nothing in the text of the 3R Act carves out "safety" laws from the scope of its express preemption provision.

The 3R Act "defined a region that includes [Ohio], and set out certain restrictions on how states in that region can regulate railroads.  [Ohio] must abide by those restrictions, and in passing the Crew Size Law, it failed to do so."  *Ind. R.R. Co.*, 576 F. Supp. 3d at 577.  This Court should accordingly hold that the 3R Act preempts the Crew Size Law and grant summary judgment to AAR.

**B.      The Crew Size Law Is Preempted By ICCTA.**

Alternatively, AAR is entitled to judgment as a matter of law because the Crew Size Law conflicts with and is preempted by ICCTA.  ICCTA provides that "[t]he jurisdiction of the [Surface Transportation] Board over … transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers … is *exclusive*."  49 U.S.C. § 10501(b) (emphasis added).  Because ICCTA's remedies are "exclusive," they "preempt the remedies provided under Federal or State law."  *Id.*

"Congress's intent in [ICCTA] to preempt state and local regulation of railroad transportation has been recognized as broad and sweeping."  *Union Pac. R.R. Co. v. Chi. Transit Auth.*, 647 F.3d 675, 678 & n.1 (7th Cir. 2011) (collecting cases).  Congress emphasized that state regulation "'would undermine the uniformity of Federal standards and risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation.'"  *Fayus Enters. v. BNSF Ry. Co.*, 602 F.3d 444, 452 (D.C. Cir. 2010) (quoting H.R. Rep. No. 104-311, at 96, *as reprinted in* 1995 U.S.C.C.A.N. 793, 808).

ICCTA "preempts *all* state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Delaware v. STB*, 859 F.3d 16, 18 (D.C. Cir. 2017) (emphasis added; quotation marks omitted). "[S]tate or local statutes or regulations are preempted *categorically* if they have the effect of managing or governing rail transportation." *Id.* at 19 (emphasis added; quotation marks omitted). And even state laws "that are not categorically preempted may still be impermissible if, as applied, they would have the effect of unreasonably burdening or interfering with rail transportation." *Id.*

The Crew Size Law conflicts with and is preempted by ICCTA because it will manage and govern rail transportation. If the Crew Size Law is enforced, it would forbid freight railroads in Ohio from operating with a single crew member.

Moreover, the Crew Size Law unreasonably burdens and unreasonably interferes with rail transportation. Railroads are large networks that produce efficiencies through operations across state lines—a carload of freight can move across the country without state-based impediments, benefitting both the shipper and the public. Permitting Ohio to impose crew size requirements that are not mandated by neighboring states would reduce those efficiencies and burden interstate commerce: Trains moving between states with differing crew size requirements would need to stop to add or remove crew members, causing railroads to incur additional costs for rest facilities and crew transportation and—ultimately—reducing efficiencies for shippers and the public. And these burdens on interstate commerce are entirely unreasonable. Under the Crew Size Law, it does not matter whether operating with a single crew member is just as safe as operating with multiple crew members, whether a railroad operates with a single crew member in adjacent states, or even whether the railroad has a collective bargaining agreement permitting single-

12

person operations.  The Crew Size Law thus imposes the balkanized and unreasonably burdensome system of transportation regulations that ICCTA was designed to prevent.

To be sure, the Sixth Circuit has "suggest[ed] that if a regulation has a connection with rail safety," then FRSA, rather than ICCTA, "'provides the applicable standard for assessing federal preemption.'"  *CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 280 (6th Cir. 2019) (quoting *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 524 (6th Cir. 2001)).  But that does not and cannot mean that a state may evade ICCTA preemption merely by claiming that its law is connected to safety.  *Cf. CSX Transp., Inc. v. City of Plymouth*, 86 F.3d 626, 629 (6th Cir. 1996) (lack of "reference to" safety on face of law was not dispositive under FRSA).  Permitting states to do so would turn ICCTA into a dead letter.  And in *CSX Transportation*, the Sixth Circuit held that ICCTA preempted a law requiring municipal consent before changing the height of grade crossings—even though that law, according to the city, was connected to two "safety concerns." 924 F.3d at 280.

Indeed, in deciding that FRSA preemption rather than ICCTA preemption applied to the track clearance provisions at issue in *Tyrrell*, the Sixth Circuit noted that "federal and state case law" classified such laws as connected to "rail safety."  248 F.3d at 523–24.  Here, the opposite is true.  Although states have repeatedly attempted to justify minimum crew size laws as connected to safety, those arguments have been consistently rejected, with courts concluding that such laws are connected to labor and economic issues, not safety.  *See*, *e.g.*, *Ind. R.R. Co.*, 576 F. Supp. 3d at 577 ("The prohibition on certain states passing laws related to crew size doubtless has some implications for safety, but this can be said of many economically motivated rules."); *Norfolk & W. Ry.*, 858 F. Supp. at 1218 (purpose of West Virginia law was "creation or maintenance of railroad jobs").

Like those laws, the Crew Size Law "is a blanket prohibition on one person crewed locomotives, regardless of safety circumstances." *Norfolk & W. Ry.*, 858 F. Supp. at 1218.  And "whatever the purposes of the [Ohio] statute, *Congress* evidently saw no legitimate safety reasons" for railroads to employ the number of crew members "required under [Ohio] law." *Keeler*, 582 F. Supp. at 1550.  Ohio therefore cannot evade ICCTA preemption merely by claiming that the Crew Size Law is connected with safety.

### C. The Crew Size Law Is Preempted In Part By FRSA.

Finally, even if the Crew Size Law were connected to safety, AAR would still be entitled to judgment as a matter of law because the Crew Size Law is preempted in part by FRSA.  In FRSA, Congress directed that "[l]aws, regulations, and orders related to railroad safety" must be "*nationally uniform* to the extent practicable." 49 U.S.C. § 20106(a)(1) (emphasis added).  To ensure national uniformity, FRSA generally provides that a state law is preempted when FRA "prescribes a regulation or issues an order covering the subject matter of the State requirement." *Id.* § 20106(a)(2).  A federal regulation or order covers the subject matter of a state law when "the federal regulations substantially subsume the subject matter of the relevant state law." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664–65 (1993).

When FRA regulates in an area related to railroad safety, states may not also regulate in that area.  Likewise, as the Sixth Circuit has explained, FRA's "explicit refusal to adopt a regulation" regarding a particular subject matter amounts to "a determination" that no such regulation is "appropriate, and thus amount[s] to negative preemption" of any such state regulation. *Norfolk & W. Ry. Co.*, 926 F.2d at 570.  In other words, when "FRA examines a safety concern regarding an activity and affirmatively decides that *no* regulation is needed, this has the effect of being an order that the activity is *permitted*." *Burlington N. & Santa Fe Ry. Co. v. Doyle*, 186 F.3d 790, 801 (7th Cir. 1999) (emphases added).  In that circumstance, "States are

14

*not permitted* to use their police power to enact such a regulation." *Marshall v. Burlington N., Inc.*, 720 F.2d 1149, 1154 (9th Cir. 1983) (emphasis added). Stated plainly, a federal determination not to regulate can "take[ ] on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute," and thus any state law enacting such a regulation is preempted. *Ray v. Atl. Richfield Co.*, 435 U.S. 151, 178 (1978).

That is what FRA did with respect to remote control operations in yards. In 2001, FRA issued a safety advisory to provide guidance for conducting such operations, while expressly declining to prohibit them. 66 Fed. Reg. at 10,343. In 2009, FRA denied a petition from a labor union to prohibit one-person operating crews, including remote control locomotive operations. *See Denial of BLET Petition on RCO and Other Single-Person Operations*, *supra*. And FRA has since promulgated extensive regulations covering remote control operations, without prohibiting one-person crews. *See* 49 C.F.R. § 229.15. Those orders constitute precisely the "sort of affirmative decision [that] preempts state requirements." *Doyle*, 186 F.3d at 802. And although FRA is currently considering whether to adopt a nationwide crew size rule, its proposed rule categorically exempts remote control operations, thus preserving the status quo—no minimum crew size regulation is necessary or appropriate. *See* 87 Fed. Reg. at 45,617–18.

The Crew Size Law requires two-person crews for every train or light engine used in connection with the movement of freight, except for "hostler service or utility employees." Ohio Rev. Code § 4999.09(B). It is thus preempted by FRSA to the extent that it mandates a minimum number of crew members for remote control operations: FRA's "order[s] covering the subject matter" of minimum crew size for such operations leave no room for Ohio to adopt or continue in force a law regulating train crew staffing for them. 49 U.S.C. § 20106(a)(2).

15

## II.   AAR I<small>S</small> E<small>NTITLED</small> T<small>O</small> S<small>UMMARY</small> J<small>UDGMENT</small> O<small>N</small> E<small>ACH</small> O<small>F</small> T<small>HE</small> C<small>OMMISSIONERS'</small> A<small>FFIRMATIVE</small> D<small>EFENSES</small>.

For the same reasons, AAR is entitled to judgment as a matter of law on the Commissioners' affirmative defenses that its 3R Act, ICCTA, and FRSA counts fail to state a claim for relief under Rule 12(b)(6).  *See* Answer, ECF No. 21, PageID # 158–59, ¶¶ 2, 3.  It is entitled to judgment as a matter of law on the other affirmative defenses as well.

*First*, this suit seeking declaratory and injunctive relief against the Commissioners in their official capacities is not barred by the Eleventh Amendment.  *See* Answer, ECF No. 21, PageID # 158, ¶ 1.  It has been settled for more than a century that the Eleventh Amendment does not bar such suits against "individual commissioners in their official capacities, pursuant to the doctrine of *Ex parte Young*, 209 U.S. 123 . . . (1908)."  *Verizon Md.*, 535 U.S. at 645.

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Verizon Md.*, 535 U.S. at 645 (cleaned up).  Here, AAR seeks "injunctive and declaratory relief," alleging that the Crew Size Law is "pre-empted" by federal law.  *Id.*  That "prayer for injunctive relief—that state officials be restrained from enforcing" the Law "in contravention of controlling federal law—clearly satisfies [that] 'straightforward inquiry.'"  *Id.*  And "the prayer for declaratory relief adds nothing to the prayer for injunction."  *Id.* at 646.  Thus, this suit is obviously not barred by the Eleventh Amendment, and AAR is entitled to judgment as a matter of law on that defense.

*Second*, AAR just as plainly has associational standing to bring this suit on behalf of its members.  *See* Answer, ECF No. 21, PageID # 159–61, ¶ 4.  An association has standing when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it

seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). This lawsuit is germane to AAR's purpose—representing its member railroads in proceedings before Congress, administrative agencies, and the courts in matters of common interest, such as the issues involved in this lawsuit. *See* Declaration of Theresa Romanosky ("Romanosky Decl.") (Exhibit D), ¶ 5. And nothing about this suit requires the participation of any individual member: neither the preemption claims "nor the request for declaratory and injunctive relief requires individualized proof." *Hunt*, 432 U.S. at 344.

The only element that the Commissioners appear to challenge is whether any of AAR's members would have standing in their own right. They plainly do. Where "the plaintiff is himself an object of the [governmental] action (or forgone action) . . . there is ordinarily little question that the action or inaction has caused him injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). Here, AAR members, including Canadian National Railway, CSX Transportation, and Norfolk Southern Railway Company, operate in Ohio. *See* Romanosky Decl. ¶ 6. And both CSX and Norfolk Southern use one-person crews for certain operations in Ohio. *See* Brown Decl. ¶ 6; Barner Decl. ¶ 6. They have thus *already* suffered cognizable injuries, because they are the "object" of the Crew Size Law and must conform their current and future operations to the Law's requirements. *See* Brown Decl. ¶ 6; Barner Decl. ¶¶ 6–7. Where government action is concerned, a plaintiff is not required "to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128–29 (2007).

17

In addition, the Crew Size Law injures AAR's members by interfering with the collective bargaining process, including their ability to implement bargained-for crew size changes in Ohio. *See Bhd. of Locomotive Eng'rs & Trainmen v. STB*, 457 F.3d 24, 27–28 (D.C. Cir. 2006) (recognizing that interference with "the opportunity to negotiate" is "sufficient to meet" the "injury . . . requirement[] of the standing inquiry").  Crew size is subject to collective bargaining between AAR's members and the railroad unions.  *See* Romanosky Decl. ¶ 7; Brown Decl. ¶ 7; Barner Decl. ¶ 8; *Train Crew Staffing*, 81 Fed. Reg. at 13,937 ("crew size has been an issue for labor relations").  AAR's members accordingly have the right to bargain for changes in crew size both systemwide and in Ohio.  *See* Romanosky Decl. ¶ 7; Brown Decl. ¶ 7; Barner Decl. ¶ 8. But the Crew Size Law interferes with that right by mandating two-person crews, thus precluding AAR's members from implementing any bargained-for agreement to use one-person crews in Ohio.

The Commissioners assert that AAR's members lack standing because they have not (yet) enforced the Crew Size Law—and might not enforce it against AAR's members.  Answer, ECF No. 21, PageID # 160, ¶ 4.  But that assertion misunderstands the relevant test.  "While defendants have not enforced or threatened to enforce this statute against plaintiffs . . . , they also have not *explicitly disavowed* enforcing it in the future."  *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015) (emphasis added).  "In such situations, the Supreme Court has held that plaintiffs have standing to challenge statutes"—as has the Sixth Circuit.  *Id.*; *see also Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Sup. Ct.*, 769 F.3d 447, 452 (6th Cir. 2014) (holding that plaintiff had standing where state refused to disavow the enforcement of the statute as applied to plaintiff).

Nor could the Commissioners credibly disavow enforcing the Crew Size Law.  To the contrary, they are required by Ohio law to "inquire into any neglect or violation of the laws of [Ohio]"; to "enforce" all "laws relating to railroads"; and to "report violations thereof to the attorney general."  Ohio Rev. Code § 4907.08.

Moreover, persons *other* than the Commissioners "may initiate enforcement" of the Crew Size Law, which "bolsters the credibility of enforcement."  *Platt*, 769 F.3d at 452 (cleaned up); *see* Answer, ECF No. 21, PageID # 160, ¶ 4 ("Plaintiff does not allege that a . . . complaint case to enforce the Crew Size Law was filed or is pending with the Commission").  Specifically, "[i]f, *upon complaint* or otherwise, the [C]ommission has reason to believe that a railroad . . . has violated or is violating any law of" Ohio, "it *shall* examine into the matter."  Ohio Rev. Code § 4907.08 (emphases added).  As a result, the Commissioners cannot credibly disavow even the intent to investigate AAR's members' operations; if a third-party files a complaint, the Commissioner must investigate and enforce the Crew Size Law.

The Commissioners' reliance on *Grendell v. Ohio Supreme Court*, 252 F.3d 828 (6th Cir. 2001), is accordingly misplaced.  There, the plaintiff had previously been sanctioned for filing a frivolous lawsuit.  *Id.* at 831.  But he did *not* allege that he was "bringing or highly likely to bring" another lawsuit—much less that "such lawsuit [wa]s allegedly frivolous," would result in discretionary sanctions, or that the imposition of such sanctions would violate his due process rights.  *Id.* at 833.  Under those circumstances, which involved no allegation that the plaintiff was engaged or wanted to engage in conduct violating a facially unconstitutional statute, the threat of future injury was too remote to confer standing.  *Id.*  That fact pattern has nothing in common with this case.

Here, unless and until the Commissioners explicitly disavow enforcement of the Crew Size Law against AAR's members—which they cannot do—AAR has standing to bring a pre-enforcement challenge to the Law and this Court should grant judgment to AAR on this affirmative defense.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment to AAR on its claims and the Commissioners' affirmative defenses and declare the Crew Size Law preempted and unenforceable.

Dated: September 25, 2023     Respectfully submitted,

            /s/ *Jonathan N. Olivito*

            Jonathan N. Olivito (0092169), Trial Attorney
            Amy D. Vogel (0075169)
            TAFT STETTINIUS & HOLLISTER LLP
            41 S. High Street, Suite 1800
            Columbus, OH 43215-4213
            Phone: (614) 221-2838
            Fax: (614) 221-2007
            jolivito@taftlaw.com
            avogel@taftlaw.com

            Thomas H. Dupree Jr. (admitted *pro hac vice*)
            Jacob T. Spencer (admitted *pro hac vice*)
            GIBSON, DUNN & CRUTCHER LLP
            1050 Connecticut Avenue, NW
            Washington, DC 20036
            (202) 955-8500
            tdupree@gibsondunn.com

            *Attorneys for Plaintiff AAR*

## **CERTIFICATE OF SERVICE**

I certify that on September 25, 2023, I electronically filed the foregoing with the Clerk of Court by using the Court's CM/ECF system, which will send a notice of this electronic filing to all counsel of record.

*/s/ Jonathan N. Olivito*
Jonathan N. Olivito