**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| ASSOCIATION OF AMERICAN RAILROADS, <br><br> Plaintiff, <br><br> v. <br><br> DAVE YOST, *Ohio Attorney General*, *et al.*, <br><br> Defendants. | Case No. 2:23-cv-2096 <br><br> Judge Michael H. Watson <br><br> Magistrate Judge Kimberly A. Jolson |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Two years ago, the U.S. District Court for the Northern District of Illinois held that the

3R Act, 45 U.S.C. § 797j, preempted an Illinois law that would have "mandate[d] a crew size of

two to perform the task, function or operation of moving freight with a train or light engine."

*Indiana R.R. Co. v. Illinois Com. Comm'n*, 576 F. Supp. 3d 571, 576 (N.D. Ill. 2021).[1]  That "is

exactly what the 3R Act prohibits," in language that "is too specific to ignore."  *Id.* at 575–76.

Ohio's Crew Size Law is almost identical to Illinois' law.  *Compare* Ohio Rev. Code

§ 4999.09(B) (railroads shall not "order or otherwise require a train or light engine used in

connection with the movement of freight to be operated unless it has a crew that consists of at

least two individuals"), *with Indiana R.R. Co.*, 576 F. Supp. 3d at 573 ("'No rail carrier shall

operate or cause to operate a train or light engine used in connection with the movement of

freight unless it has an operating crew of at least 2 individuals.'").  The Commissioners' Motion

for Summary Judgment ("PUCO Mot.") confirms that this Court should reach the same result

here, hold that the 3R Act preempts the Crew Size Law, and grant summary judgment to AAR.

---

[1] Defined terms used herein have the same meaning as in Plaintiff's Motion for Summary
Judgment ("AAR Mot."), ECF No. 26, PageID # 233–52.

Remarkably, the Commissioners do not even attempt to distinguish *Indiana Rail Road Co.*—a decision they do not cite even a single time in their summary judgment motion.  Nor could they:  That court's well-reasoned decision rejected each argument the Commissioners advance here, including their attempt to create an atextual exception for "safety" regulations and their assertion that the 3R Act is unconstitutional.  Neither those arguments nor the Commissioners' baseless contention that AAR's members—the direct *objects* of the Crew Size Law—lack standing to challenge the Law provide any basis for departing from the decision of the Northern District of Illinois.  Ohio "must abide by th[e] restrictions" of the 3R Act, "and in passing the Crew Size Law, it failed to do so."  *Indiana R.R. Co.*, 576 F. Supp. 3d at 577.

This Court should grant summary judgment to AAR, deny summary judgment to the Commissioners, and hold that the 3R Act preempts the Crew Size Law.

## ARGUMENT

I.      **AAR IS ENTITLED TO SUMMARY JUDGMENT ON EACH OF ITS CLAIMS.**

A.      **The Crew Size Law Is Preempted By The 3R Act.**

In 2019, Illinois enacted a crew size law that provided:  "'No rail carrier shall operate or cause to operate a train or light engine used in connection with the movement of freight unless it has an operating crew of at least 2 individuals.'"  *Indiana R.R. Co.*, 576 F. Supp. 3d at 573.  "The asserted purpose of this law . . . was to 'enhance public safety.'"  *Id.*  The Northern District of Illinois held that Illinois' law was preempted by the plain text of the 3R Act:  "The Act defined a region that includes Illinois, and set out certain restrictions on how states in that region can regulate railroads.  Illinois must abide by those restrictions, and in passing the Crew Size Law, it failed to do so."  *Id.* at 577.

Ohio's virtually identical Crew Size Law is likewise preempted by the 3R Act.  Like Illinois, Ohio forbids railroads from operating a "train or light engine used in connection with the

movement of freight . . . unless it has a crew that consists of at least two individuals."  Ohio Rev.

Code § 4999.09(B).  Like Illinois, Ohio insists that its Law is "solely related to safety."  *Id.*

§ 4999.09(A).  Like Illinois, Ohio wants to mandate a crew size of two to perform the task,

function, or operation of moving freight with a train or light engine.  Because that is exactly what

the 3R Act prohibits, this Court should grant summary judgment to AAR.

The Commissioners have no response to *Indiana Rail Road Co.*, a decision they do not

even cite in their motion for summary judgment.  Nor could they have distinguished that case,

which rejected each argument the Commissioners offer in defense of the Crew Size Law.  In fact,

it was so clear that the Illinois crew-size statute was preempted by the 3R Act, the Illinois

Attorney General—who is tasked with defending all statutes enacted by the Legislature if a

reasonable defense can be made—declined to appeal the decision to the Seventh Circuit.

*First*, the Commissioners bizarrely suggest that the Crew Size Law does not require

railroads "to hire a specified number of persons to be employed in certain positions and perform

particular tasks."  PUCO Mot., ECF No. 25, PageID # 178–79.  But Ohio indisputably

"mandate[s] a crew size of two to perform the task, function or operation of *moving freight with*

*a train or light engine*."  *Indiana R.R. Co.*, 576 F. Supp. 3d at 576 (emphasis added).  Because

that "is exactly what the 3R Act prohibits," there is a "clear conflict" between the Crew Size Law

and the 3R Act's express preemption provision.  *Id.*

Nothing in the text of the 3R Act suggests that preemption turns on whether a State

requires a particular number of engineers or conductors or "brakemen."  PUCO Mot., ECF No.

25, PageID # 179.  To the contrary, the Act prohibits Ohio from requiring "*any* specified number

of persons to perform *any* particular task, function, or operation."  45 U.S.C. § 797j (emphases

added).  The Act prevents states from making staffing and operating judgments that are the

province of the railroads.  Ohio thus cannot dictate that a moving freight train must have, for

example, a conductor; it thus makes no difference that the Crew Size Law may not require "more

than 1 like 2 or 3."  PUCO Mot., ECF No. 25, PageID # 178.  Indeed, if the Commissioners were

correct, nothing would prevent Ohio from re-enacting its law requiring a "full train crew,

consisting of five persons"—a law the Commissioners concede "the 3R Act was intended to

preempt."  *Id.* at 179.

The Commissioners do not and cannot cite any authority in support of their atextual

reading of the 3R Act.  After all, Illinois' preempted law similarly required "'an operating crew

of at least 2 individuals,'" *Indiana R.R. Co.*, 576 F. Supp. 3d at 573, without further specifying

which tasks those individuals must perform beyond "the task, function or operation of moving

freight with a train or light engine," *id.* at 576.  Likewise, the West Virginia law at issue in

*Norfolk & Western Railway Co. v. Public Service Commission of West Virginia*, prohibited

railroads from permitting crew-controlled locomotive power units "'to be operated by a crew of

fewer than two persons.'"  858 F. Supp. 1213, 1215 (Reg'l Rail Reorg. Ct. 1994).  Although that

law specified the *qualifications* for those crew members, it did not specify the *tasks* those crew

members would have to perform as part of the crew.  *See id.*  Nonetheless, the court concluded

that West Virginia's law was "specifically proscribed to the States" by the 3R Act.  *Id.* at 1218.

The same is true here.

*Second*, the Commissioners repeat Illinois' failed argument that the 3R Act does "not

preempt laws about crew sizes when those laws were concerned exclusively with safety."

*Indiana R.R. Co.*, 576 F. Supp. 3d at 576 (citing *Norfolk & W. Ry. Co.*, 858 F. Supp. at 1217);

*see* PUCO Mot., ECF No. 25, PageID # 179–82 (relying on *Norfolk & W. Ry. Co.*, 858 F. Supp.

at 1217).  As the Northern District of Illinois explained, "given the plain language of the statute,

4

the reasoning of the Special Court, when it suggested that a safety-based regulation of crew sizes might not be preempted by the 3R Act, is not especially persuasive." *Indiana R.R. Co.*, 576 F. Supp. 3d at 576.  "Nor does it appear that the Special Court ever actually upheld a safety-based regulation of crew size after hinting that this might be possible." *Id.* at 576–77; *see also id.* at 576 n.3 ("Overall, the additional Special Court cases do more to hurt the defense than help it.  In fact, in all three cases the Special Court found that state analogues to Illinois's Crew Size Law *were* preempted by the 3R Act.").

Indeed, "the Supreme Court has increasingly embraced a textualist jurisprudence that would not support the reasoning of the special court." *Indiana R.R. Co.*, 576 F. Supp. 3d at 576.  When considering the scope of an express preemption clause, courts should "focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (quotation marks omitted).  And the plain wording of the 3R Act's preemption clause nowhere exempts minimum crew size laws purportedly concerned with "safety."  That leaves no room for the Commissioners' argument based on the "purpose" of the 3R Act.  PUCO Mot., ECF No. 25, PageID # 180.

Moreover, even if the 3R Act did not preempt pure safety regulations, that would not salvage the Crew Size Law.  Saying something does not make it so.  Despite the Law's proclamation that its requirements are "solely related to safety," Ohio Rev. Code § 4999.09(A), it lacks key "indicia necessary to conclude that it was enacted solely" for that purpose.  *Norfolk & W.*, 858 F. Supp. at 1218.  For one thing, "the statute is a blanket prohibition on one person crewed locomotives, *regardless of safety circumstances*." *Id.* (emphasis added).  For another, the "testimony" on which the Commissioners rely comes from "the Ohio State Legislative Board

Chairman and Legislative Director of the Brotherhood of Locomotive Engineers and Trainmen"—hardly an economically disinterested party. PUCO Mot. Ex. F, ECF No. 25-6, PageID # 228; *see also Indiana R.R. Co.*, 576 F. Supp. 3d at 577 ("Matters of economics and safety cannot always be kept completely separate."). And, most important, "whatever the purposes of the [Ohio] statute, *Congress* evidently saw no legitimate safety reasons" for railroads to employ the number of crew members "required under [Ohio] law." *Keeler v. Consol. Rail Corp.*, 582 F. Supp. 1546, 1550 (Reg'l Rail Reorg. Ct. 1984).

*Third*, the Commissioners contend that the 3R Act cannot constitutionally apply to Ohio under the reasoning of *Shelby County v. Holder*, 570 U.S. 529 (2013). *See* PUCO Mot., ECF No. 25, PageID # 182–85. "But that mode of analysis has no application here at all." *Indiana R.R. Co.*, 576 F. Supp. 3d at 577.

*Shelby County* concerned the coverage formula of § 4 of the Voting Rights Act, which Congress did not update when it reauthorized the formula in 2006 and extended its coverage for another 25 years. *See* 570 U.S. at 535, 539. Jurisdictions covered by § 4 were required under § 5 of the Act to "obtain federal permission before enacting any law related to voting." *Id.* at 535. As the Supreme Court explained, the Act represented "an extraordinary departure from the traditional course of relations between the States and the Federal Government." *Id.* at 545 (internal quotation marks omitted). As a general matter, the federal government does not have the "right to review and veto state enactments before they go into effect." *Id.* at 542. Rather, the Constitution typically "allow[s] state laws to take effect, subject to later challenge under the Supremacy Clause." *Id.* Moreover, the Act "authorize[d] federal intrusion into sensitive areas of state and local policymaking," *id.* at 545—specifically, "the power to regulate elections," which "the Framers of the Constitution intended the States to keep for themselves," *id.* at 543 (internal

6

quotation marks omitted).  "And in the context of a decision as significant as th[at] one—

subjecting a disfavored subset of States to extraordinary legislation otherwise unfamiliar to our

federal system," the Supreme Court applied the "principle of equal sovereignty" to decide

whether the coverage formula Congress reauthorized in 2006 was based on "current data

reflecting current needs."  *Id.* at 544, 552–53.

The 3R Act has nothing in common with § 4 of the Voting Rights Act.  It does not

require Ohio to seek permission from the federal government before enacting any laws; rather, it

subjects Ohio laws to normal review within "the strictures of the Supremacy Clause."  *Shelby

Cnty.*, 570 U.S. at 543.  And the 3R Act was enacted, as the Commissioners note, under

Congress's "Commerce Clause authority."  PUCO Mot., ECF No. 25, PageID # 182.  That

authority is "plenary and complete in itself, may be exercised to its utmost extent, and

acknowledges no limitations other than [those] prescribed in the Constitution," *United States v.

Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942)—*unlike* Congress's authority under the

Fourteenth and Fifteenth Amendments, which requires "congruence and proportionality between

the injury to be prevented or remedied and the means adopted to that end."  *City of Boerne v.

Flores*, 521 U.S. 507, 520 (1997).

The Commissioners assert that "[t]he equal sovereignty doctrine is not limited in

application to the Voting Rights Act."  PUCO Mot., ECF No. 25, PageID # 184.  But they

provide no authority for that proposition.  For good reason:  Before the Supreme Court applied

that principle to the Voting Rights Act, it had held that the "doctrine of the equality of States . . .

applies *only* to the terms upon which States are admitted to the Union, and not to the remedies

for local evils which have subsequently appeared."  *South Carolina v. Katzenbach*, 383 U.S. 301,

328–29 (1966) (emphasis added).  And courts of appeals have subsequently explained that the

7

"equal sovereignty doctrine has been applied *only* in such extraordinary situations," *Mayhew v. Burwell*, 772 F.3d 80, 95 (1st Cir. 2014) (emphasis added), and would be "perilous" to apply "in the context of the Commerce Clause," *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208, 238 (3d Cir. 2013), *abrogated on other grounds by Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).

Consider the consequences of accepting the Commissioners' argument here. "Federal statutes that treat States disparately," enacted under the Commerce Clause, "are hardly novelties." *See Shelby Cnty.*, 570 U.S. at 588 (Ginsburg, J., dissenting) (collecting statutes). In fact, "[f]ederal laws that have differing impacts on different states are an unremarkable feature of, rather than an affront to, our federal system." *Mayhew*, 772 F.3d at 95. Under the Commissioners' view, *all* of those laws would be subject to continual challenge as purportedly "disconnected" from current needs. Such a regime would impose enormous burdens on the federal government, which would need to compile an extensive record not just when it reauthorizes such a statute, *see Shelby Cnty.*, 570 U.S. at 553 (considering "thousands of pages of evidence" Congress compiled "before reauthorizing the Voting Rights Act"), but *whenever* a constitutional challenge is brought. Nothing in *Shelby Country* suggests that unprecedented and extraordinary result. *See Gross v. United States*, 771 F.3d 10, 15 (D.C. Cir. 2014) (explaining that "it is not the 'current circumstances' of a particular litigant that mattered to the Court" in *Shelby County*, "but rather the 'current conditions' that were before Congress *when it enacted the statute*" (emphasis added; citation omitted)).

In sum, there is no basis for distinguishing Ohio's Crew Size Law from the Illinois law struck down in *Indiana Rail Road Co.* That court correctly rejected each argument advanced by the Commissioners here. And the Commissioners fail to even acknowledge that decision, much

8

less offer a justification for departing from its well-reasoned analysis.  This Court should follow

that court, hold the Crew Size Law preempted by the 3R Act, and grant summary judgment to

AAR.

### B.      The Crew Size Law Is Preempted By ICCTA.

The Commissioners take a similarly flawed approach to ICCTA:  They make no effort to

engage with the statute's plain language and instead insist on an atextual carve-out for "safety-

related" matters.  PUCO Mot., ECF No. 25, PageID # 186.  But ICCTA, like the 3R Act,

includes an express preemption clause, 49 U.S.C. § 10501(b), and the "plain wording of the

clause . . . necessarily contains the best evidence of Congress' pre-emptive intent."  *Puerto Rico*,

579 U.S. at 125.  And that "intent . . . to preempt state and local regulation of railroad

transportation has been recognized as broad and sweeping."  *Union Pac. R.R. Co. v. Chi. Transit

Auth.*, 647 F.3d 675, 678 & n.1 (7th Cir. 2011) (collecting cases).  Indeed, the Ninth Circuit and

other "circuits have rejected the argument . . . that ICCTA preempts only economic regulation."

*Ass'n of Am. Railroads v. S. Coast Air Quality Mgmt. Dist.*, 622 F.3d 1094, 1098 (9th Cir. 2010)

(collecting cases); *accord Fayus Enters. v. BNSF Ry. Co.*, 602 F.3d 444, 451 (D.C. Cir. 2010)

("Several of the cases, in addressing these environmental regulations, note that the ICCTA 'does

not preempt only explicit economic regulation.'").

Although the Commissioners say that there "is no role for [ICCTA] to play" when it

comes to laws related to railroad safety, PUCO Mot., ECF No. 25, PageID # 186, that position

cannot be squared with the Sixth Circuit's decision in *CSX Transportation, Inc. v. City of Sebree*,

924 F.3d 276 (6th Cir. 2019).  There, the court held that ICCTA preempted a municipal grade

crossing law, *even though* the law was purportedly enacted to address two "safety concerns."  *Id.*

at 280, 285.  Moreover, the court held that FRSA *also* preempted the law, *see id.* at 285–86,

foreclosing the Commissioners' assertion that FRSA preemption and ICCTA preemption are mutually exclusive.  PUCO Mot., ECF No. 25, PageID # 186.

In any event, the Commissioners do not and cannot show that the Crew Size Law is connected to "rail safety" under the "legal analysis" they invoke.  *See* PUCO Mot., ECF No. 25, PageID # 187 (referencing a law's "terms, the safety benefits of compliance, and its legally recognized purpose").  For example, the Crew Size Law by its own terms "is a blanket prohibition on one person crewed locomotives, regardless of safety circumstances."  *Norfolk & W. Ry.*, 858 F. Supp. at 1218.  Laws regulating minimum crew size have consistently been recognized as connected to labor and economic issues, not safety.  *See* AAR Mot., ECF No. 26, PageID # 245–26 (collecting cases).  And even if the Crew Size Law "has some implications for safety," the same "can be said of many economically motivated rules."  *Indiana R.R. Co.*, 576 F. Supp. 3d at 577.[2]

Turning to the merits, under what the Commissioners agree is the Sixth Circuit's test, "'State remedies are permissible so long as (1) the remedies are not unreasonably burdensome, *and* (2) the remedies do not discriminate against railroads.'"  PUCO Mot., ECF No. 25, PageID # 188 (emphasis added) (quoting *Norfolk S. Ry. Co. v. Dille Rd. Recycling, LLC*, 644 F. Supp. 3d 427, 435 (N.D. Ohio 2022)).  Indeed, "ICCTA does not preempt state or local laws if they are laws of *general applicability* that do not *unreasonably interfere* with interstate commerce."  *Ass'n of Am. Railroads*, 622 F.3d at 1097 (emphases added); *accord Fayus*, 602 F.3d at 451

---

[2] The Commissioners begin the "Background" section of their brief by discussing the train derailment in East Palestine, and note that the Crew Size Law took effect "[s]hortly after" that derailment.  PUCO Mot., ECF No. 25, PageID # 172–73.  But, as the Commissioners well know, crew size was not implicated in the derailment:  The train was operating at the time of the derailment with a *three*-person crew.  *See* https://www.npr.org/2023/02/23/1158972561/east-palestine-train-derailment-ntsb-preliminary-report-wheel-bearing.

("The circuits appear generally, for example, to find preemption of environmental regulations, or similar exercises of police powers relating to public health or safety, only when the state regulations are either discriminatory or unduly burdensome.").  But the Crew Size Law is *not* a "rule[] of general applicability" with only an incidental effect on railroad activity; instead, it "appl[ies] *exclusively* and *directly* to railroad activity." *Ass'n of Am. Railroads*, 622 F.3d at 1098 (emphases added).  And the Crew Size Law's blanket prohibition on one-person crews regardless of safety considerations or other circumstances is plainly unreasonable.  *See* AAR Mot., ECF No. 26, PageID # 244–45.

C.    **The Crew Size Law Is Preempted In Part By FRSA.**

The Commissioners' cursory section addressing FRSA does not even acknowledge, much less offer an argument responding to, AAR's claim that the Crew Size Law is preempted to the extent that it applies to helper service or remote control operations in yards.  *See* Complaint, ECF No. 1, PageID # 21–23, ¶¶ 90–99.  The Commissioners do not dispute that FRA has considered whether to regulate one-person helper service and remote control operations and decided that no such regulation is needed.  They do not dispute that FRA's "explicit refusal to adopt a regulation" amounts to "a determination" that no such regulation is "appropriate, and thus amount[s] to negative preemption" of any such state regulation.  *Norfolk & W. Ry. Co. v. Pub. Utils. Comm'n of Ohio*, 926 F.2d 567, 570 (6th Cir. 1991).  And they do not dispute that FRA's pending crew size rule proposes to categorically exempt such operations, thereby preserving the preemptive status quo.  *See* FRA, *Train Crew Size Safety Requirements*, 87 Fed. Reg. 45,564, 45,617–18 (July 28, 2022).  Accordingly, the undisputed fact that FRA has not yet finalized that rule—the *only* "argument" the Commissioners advance, *see* PUCO Mot., ECF No. 25, PageID # 186—has no bearing on AAR's claim and provides no basis for granting summary judgment to the Commissioners.

That said, the Commissioners elsewhere assert that the Crew Size Law "has no application to helper service, switching service, and remote control operations." PUCO Mot., ECF No. 25, PageID # 172; *see also id.* at PageID # 176–77. If, and only if, the Court concludes that the Commissioners' interpretation of the Crew Size Law is correct, then it would resolve AAR's FRSA claim, which asserts FRSA preemption only to the extent the Crew Size Law applies to such operations.

## II.   AAR IS ENTITLED TO SUMMARY JUDGMENT ON EACH OF THE COMMISSIONERS' AFFIRMATIVE DEFENSES.

The Court should also grant AAR summary judgment on the Commissioners' lack-of-standing affirmative defense. The Commissioners contend that AAR lacks standing *only* because its members supposedly have not shown a "concrete injury." PUCO Mot., ECF No. 25, PageID # 174–78. But it is well settled that when a plaintiff is the direct "object" of governmental regulation, "there is ordinarily little question that the action . . . has caused him injury." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992); *accord Schickel v. Dilger*, 925 F.3d 858, 866 (6th Cir. 2019). Here, AAR's members are directly regulated by the Crew Size Law: They are freight railroads that operate in Ohio and must conform their current and future conduct to the Law's requirements. *See* AAR Mot., ECF No. 26, PageID # 249. Indeed, the Commissioners' own "testimony" regarding the basis for the Crew Size Law focuses on railroad operations in Ohio. *See* PUCO Mot. Ex. F, ECF No. 25-6, PageID # 228–30. Because AAR's members are part of the industry "[r]egulated" by the Crew Size Law, they obviously "have a concrete interest in avoiding regulatory obligations above and beyond those that can be statutorily imposed upon them." *Ohio Coal Ass'n v. Perez*, 192 F. Supp. 3d 882, 902 (S.D. Ohio 2016).

12

The Commissioners do not cite a *single* case holding that an individual or entity that is the direct "object" of government regulation lacks standing to bring a suit challenging such regulation as facially unconstitutional.  And the cases they do cite do not help them.  In *Dawson v. Department of Transportation*, for example, the plaintiff (a commercial pilot) asserted that *if* a state agency granted a landfill permit, the resulting landfill would attract a "large number of birds," rendering landings at a nearby airport unsafe.  480 F. Supp. 351, 352 (W.D. Okla. 1979).  In *Lebowich v. O'Connor*, the plaintiff sought a declaration that state officials had "violated the[ir] oaths of office," a declaration that "would be valueless" to him.  309 F.2d 111, 113–14 (2d Cir. 1962).  And in *Grocer's Co-Op. Dairy Co. v. Grand Haven*, the plaintiff lacked standing to seek an injunction requiring a municipality to grant him a license to sell milk when he had not yet sought or been denied such a license.  79 F. Supp. 938, 944–45 (W.D. Mich. 1948).  None of those cases (which are decades old and from different jurisdictions) bears any similarity to this case, where AAR's members that operate in Ohio must conform their operations to the Crew Size Law's requirements.

As explained in AAR's motion and supporting declarations, AAR's members have standing because the Crew Size Law threatens their current one-person operations in Ohio.  *See* AAR Mot., ECF No. 26, PageID # 249.  The Commissioners' standing argument appears to be based on the theory that the Crew Size Law "has no application" to those operations—*i.e.*, remote control operations.  PUCO Mot., ECF No. 25, PageID # 176–78.  The Commissioners do not explain whether that theory is based on the Crew Size Law's exception for "'hostler service or utility employees,'" its use of the word "train," or their own enforcement discretion.  *See id.* But the Commissioners do not "explicitly disavow[] enforcing" the Crew Size Law against AAR's members.  *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 696 (6th Cir. 2015).  And even

13

if their argument is based on the current Commissioners' interpretation of the Crew Size Law,

there is no guarantee that future Commissioners will share that interpretation. As a result,

AAR's members plainly have standing based on their current one-person operations absent some

legally binding interpretation guaranteeing that such operations do not fall within the scope of

the Law.

Moreover, even if the Crew Size Law did not apply to AAR's members' current one-

person operations, they would still have standing because the Law limits their options for *future*

operations. The Law expressly provides that AAR's members operating in Ohio may not "order

or otherwise require a train or light engine used in connection with the movement of freight to be

operated unless it has a crew that consists of at least two individuals." Ohio Rev. Code

§ 4999.09(B). Thus, the Law curtails AAR's members' staffing and operational judgments, and

prohibits AAR's members from expanding their current one-person operations in Ohio. As the

Sixth Circuit recently explained, "[w]hen a plaintiff sues for injunctive relief, the threat of future

harm can satisfy th[e injury-in-fact] requirement as long as there is a 'substantial risk' that the

harm will occur." *Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 391 (6th Cir. 2022).

Here, the legal prohibition on future one-person operations—and thus the harm to AAR's

members—will *necessarily* occur: The Crew Size Law was duly enacted before AAR filed this

suit and will continue to restrict its members' operations as long as it remains on the books.

In addition, as the Commissioners repeatedly acknowledge, "train crew sizes are

determined through collective bargaining." PUCO Mot., ECF No. 25, PageID # 175; *see also id.*

at PageID # 173, 176. AAR's members have the right to bargain for changes in crew size both

systemwide and in Ohio. *See* AAR Mot., ECF No. 26, PageID # 250. The Crew Size Law

therefore independently injures AAR's members by interfering with that right, including by

14

precluding them from implementing any bargained-for crew size changes in Ohio. *See Bhd. of Locomotive Eng'rs & Trainmen v. STB*, 457 F.3d 24, 27–28 (D.C. Cir. 2006). It makes no difference whether AAR's "members have or are currently attempting to negotiate new CBAs on crew size." PUCO Mot., ECF No. 25, PageID # 176. Regardless of when the next rounds of collective bargaining over crew size in Ohio occur, the Crew Size Law will still require a minimum of two crew members and thus will continue to interfere in the collective bargaining process.[3]

In short, AAR's members are directly regulated by the Crew Size Law, which governs their current and future operations and interferes with their collective bargaining rights, have standing to challenge it—and the Commissioners' argument provides no basis for concluding otherwise.[4]

**CONCLUSION**

For the foregoing reasons and those offered in AAR's motion for summary judgment, this Court should grant summary judgment to AAR on its claims and the Commissioners' affirmative defenses, deny summary judgment to the Commissioners, and declare the Crew Size Law preempted and unenforceable.

---

[3] As noted above, the train that derailed in East Palestine had a three-person crew. *See supra* n.2. The Commissioners' assertion that "negotiating less than a two-person crew for railroad operations in Ohio is not a reality or believable" in the "aftermath of East Palestine" is—unsurprisingly—supported by neither citation nor explanation. PUCO Mot., ECF No. 25, PageID # 176.

[4] The Commissioners have abandoned their affirmative defense that the Eleventh Amendment bars this suit by failing even to mention the defense in their summary judgment motion. For that reason, and because the Eleventh Amendment does not bar suits for declaratory and injunctive relief against individual Commissioners sued in their official capacities, AAR is entitled to judgment as a matter of law on that defense. *See* AAR Mot., ECF No. 26, PageID #248.

15

Dated:  October 25, 2023

Respectfully submitted,

/s/ *Jonathan N. Olivito*

Jonathan N. Olivito (0092169), Trial Attorney
Amy D. Vogel (0075169)
TAFT STETTINIUS & HOLLISTER LLP
41 S. High Street, Suite 1800
Columbus, OH 43215-4213
Phone: (614) 221-2838
Fax: (614) 221-2007
jolivito@taftlaw.com
avogel@taftlaw.com

Thomas H. Dupree Jr. (admitted *pro hac vice*)
Jacob T. Spencer (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC  20036
(202) 955-8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com

*Attorneys for Plaintiff AAR*

16

## **CERTIFICATE OF SERVICE**

I certify that on October 25, 2023, I electronically filed the foregoing with the Clerk of

Court by using the Court's CM/ECF system, which will send a notice of this electronic filing to

all counsel of record.


*/s/ Jonathan N. Olivito*
Jonathan N. Olivito