UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

ASSOCIATION OF AMERICAN RAILROADS,

    Plaintiff,

v.

JENIFER FRENCH, et al.

    Defendants.

Case No. 23-cv-02096-MHW-KAJ

**UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF THE CONSTITUTIONALITY OF 45 U.S.C. § 797j**

In 1973, Congress established the Consolidated Rail Corporation (Conrail) to save the railroad system in the northeast and midwest regions from insolvency. To further those efforts, Congress later added a preemption provision, Section 797j, to the Regional Rail Reorganization Act of 1973 (3R Act), that prohibits Ohio and other states in Conrail's region of operation from requiring that railroads "employ any specified number of persons to perform any particular task, function, or operation." 45 U.S.C. § 797j; *see* Pub. L. No. 93-236, 87 Stat. 985, as amended (45 U.S.C. 701 *et seq.*). While it is true that Congress sold Conrail in the 1980s and the railroad system in the northeast and midwest is solvent today, Section 797j remains a constitutional exercise of Congress's Article I authority.

The United States understands that the State of Ohio enacted the "Crew Size Law," Ohio Rev. Ann. Code § 4999.09, after a train derailment in East Palestine, Ohio in February 2023 caused a dayslong fire and a release of toxic chemicals. *See* Defs.' Mot. for Sum. J. at 2-3 (ECF 25). The

1

Crew Size Law provides that "[a] train or light engine used in connection with the movement of freight shall have a crew that consists of at least two individuals." Ohio Rev. Code § 4999.09(B).

On June 29, 2023, the Association of American Railroads (AAR or Plaintiff), a railroad trade association, sued the five Commissioners of the Ohio Public Utilities Commission (collectively, Defendants). Compl. ¶ 16 (ECF No. 1). Plaintiff argues that, *inter alia*, the Crew Size Law is preempted by Section 797j of 3R Act.

On September 25, 2023, Defendants filed a motion for summary judgment, arguing that AAR lacked standing, that the Crew Size Law is not preempted by the 3R Act, that the 3R Act is unconstitutional because it violates the "equal sovereignty" doctrine of the Tenth Amendment, and that the Crew Size Law is not preempted by either the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20106(a), or the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. § 10501(b). The next day, Defendants filed and served a notice of constitutional question pursuant to Rule 5.1(a) of the Federal Rules of Civil Procedure. *See* ECF 27. On November 17, 2023, this Court extended the United States' deadline to intervene to December 18, 2023.[1]

## ARGUMENT

The Court should decline to address the constitutionality of Section 797j of the 3R Act until it resolves all non-constitutional issues raised in Defendants' motion for summary judgment. *See, e.g.*, *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981) ("[P]rior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision."). The United States takes no position on Defendants' non-constitutional arguments; it intervenes in this matter

---

[1] The Federal Railroad Administration has issued a notice of proposed rulemaking addressing minimum crew size requirements for railroad train crews. *See* Train Crew Size Safety Requirements, 87 Fed. Reg. 45,564 (July 28, 2022). If issued, the final rule would preempt Ohio's Crew Size Law under the preemption provision of the FRSA, 49 U.S.C. § 20106. *See* 87 Fed. Reg. at 45,570-71.

solely for the limited purpose of defending the constitutionality of Section 797j of the 3R Act. If the Court reaches Defendants' constitutional challenge, it should reject Defendants' invitation to weaken Congress's Article I authority by misapplying the Supreme Court's decision in *Shelby County v. Holder*, 570 U.S. 529 (2013).

### A. The Commerce Clause Does Not Require Geographic Uniformity.

Congress enacted Section 797j in an exercise of its authority under the Commerce Clause. The Commerce Clause, unlike certain other constitutional provisions, such as those addressing indirect taxes, naturalization, and bankruptcy, *see* U.S. Const. art. I, § 8, cl. 1; § 8, cl. 4; § 9, cl. 6, does not contain any express requirement of geographic uniformity. *See Currin* v. *Wallace*, 306 U.S. 1, 14 (1939) (holding that "[t]here is no requirement of uniformity in connection with the commerce power," and that imposing such a requirement "would be to impose a limitation which the Constitution does not prescribe"). Elsewhere, the Constitution provides that "[n]o preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another." U.S. Const. Art. I, § 9, Cl. 6. That express limitation supplies a strong negative inference that no *other* state-specific uniformity constraint applies to the regulation of commerce. *See Gibbons* v. *Ogden*, 22 U.S. (9 Wheat.) 1, 196 (1824) (explaining that Congress's commerce power "acknowledges no limitations, other than are prescribed in the constitution"); *cf. Hodel v. Indiana*, 452 U.S. 314, 332 (1981) (a claim of arbitrariness in evaluating exercise of Commerce Clause authority "cannot rest solely on a statute's lack of uniform geographic impact").

Thus, while a "guarantee of uniformity in treatment amongst the states cabins some of Congress' powers," "no such guarantee limits the Commerce Clause." *NCAA v. Governor of N.J.*, 730 F.3d 208, 238 (3d Cir. 2013), *abrogated on other grounds by Murphy v. NCAA*, 138 S. Ct. 1461 (2018). "This only makes sense: Congress' exercises of Commerce Clause authority are

3

aimed at matters of national concern and finding national solutions will necessarily affect states differently[.]" *Id.* at 238. Consistent with these principles, Congress may have rationally elected to protect the fledgling Conrail from state regulations by preempting those laws in the states where the new company operated.

The United States Code is replete with examples where Congress elected to treat states differently with respect to preemption, either by including grandfather provisions or otherwise. For example, Congress exempted Texas' intrastate electric grid from the full panoply of federal public utility regulation, thereby allowing Texas alone to retain certain sovereign authority over power transmission not enjoyed by any other state. 16 U.S.C. §§ 824k(k), 824p(k), 824q(h), 824t(f).

Among other examples:

- Federal law preempts state regulation of most aspects of hydroelectric projects but allows Alaska to assume jurisdiction over small hydroelectric projects. 16 U.S.C. § 823c.

- Congress exempted Hawaii from preemption under the Employee Retirement Income Security Act. 29 U.S.C. § 1144(b)(5).

- Congress exempted various state laws related to energy conservation from preemption under the Energy Policy and Conservation Act. 42 U.S.C. § 6297(c)(4)-(5), (8)-(9).

- Congress authorized certain states to retain or enact special rules concerning vehicle use on interstate highways. 49 U.S.C. § 31112(c).

And beyond differentiating with respect to preemption, Congress routinely legislates in other ways intended to benefit and empower only certain states. For example, Congress has created numerous regional commissions, such as the Appalachian Regional Commission, that are partnerships between the federal government and selected states to foster regional development. *See* 40 U.S.C. chapters 143, 153.

The weight of authority demonstrates that Congress's Commerce Clause authority does not require geographic uniformity.

### B. *Shelby County* Is Inapposite.

In one distinct area of federal power outside of the Commerce Clause context, the Supreme Court recognized that principles of equal sovereignty may operate to limit certain exercises of Congress's power. Specifically, in *Shelby County*, the Court held that equal-sovereignty principles applied to limit Congress's Fifteenth-Amendment authority to impose disparate restrictions on state election procedures. The circumstances in *Shelby County* are not comparable to those here. Indeed, that case, and those construing it, make clear that equal-sovereignty principles do not constrain ordinary Commerce Clause legislation.

In *Shelby County*, the Supreme Court took pains to emphasize the "extraordinary" nature of the Voting Rights Act's (VRA) preclearance provisions. 570 U.S. at 545. Those provisions required a disfavored small subset of states to obtain federal permission before any of their laws related to voting could take effect; indeed, the Court understood the provisions to constrain those states from even "enacting" such laws. *Id.* at 534-35. The Court noted inconsistency between the preclearance requirements and the Fifteenth Amendment's "purpose" "to ensure a better future," not "to punish for the past." *Id.* at 553. Such requirements intruded into a sensitive area of state policymaking—local election regulation—that had traditionally been the exclusive province of the states. In that sensitive and specific context, the Supreme Court found a "principle of equal sovereignty" to be "highly pertinent." *Id.* at 530.

The principles of federalism that animated the heightened standard in the voting procedure context do not apply to the regulation of interstate railroads. Unlike Congress's Article I powers, the Fifteenth Amendment operates directly on states and displaces state powers historically recognized as core sovereign powers. *Shelby County* voided the VRA's preclearance provisions because they constituted a "federal intrusion into sensitive areas of state and local policymaking"

5

that "depart[ed] from the basic features of our system of government[.]" *Id.* at 545. This principle has no salience here because Congress is exercising the quintessentially federal power of regulating interstate commerce.[2]

Congress's exercise of legislative authority in enacting the 3R Act is a "basic feature" of our federal system and is consistent with well over 100 years of practice. Congress first regulated interstate railroads in 1887 when it created the Interstate Commerce Commission. And Congress began addressing railroad safety concerns through a series of statutes enacted between 1893 and 1911, including the Safety Appliance Act, now codified at 49 U.S.C. § 20301 *et seq*. and the Boiler Inspection Act, now codified at 49 U.S.C. § 20701 *et seq*. *See Napier v. Atl. Coast Line R.R.*, 272 U.S. 605, 607-608 (1926); *see also Johnson v. S. Pac. Co.*, 196 U.S. 1, 19 (1904).

The two circuit courts that have considered the question after *Shelby County* have declined to extend equal-sovereignty principles to Article I legislation. *Mayhew v. Burwell*, 772 F.3d 80, 93-96 (1st Cir. 2014); *NCAA*, 730 F.3d at 237-39. Their reasoning applies fully here.

In *Mayhew*, the First Circuit held that equal sovereignty principles were not applicable to an Affordable Care Act provision enacted under Congress's Spending Clause authority. The court noted that "[f]ederal laws that have differing impacts on different states are an unremarkable feature of, rather than an affront to, our federal system." 772 F.3d at 95. It then concluded that equal-sovereignty principles apply only in "extraordinary situations" where the federal government intrudes into sensitive areas of state policymaking. *Id.* The case presented no such situation, nor does the 3R Act.

---

[2] Doctrine in other constitutional areas also supports this conclusion. For example, the Constitution does not contain any implied requirement for "equal treatment" of states when Congress is exercising authority under Article IV's Property Clause. *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1305-09 (D.C. Cir. 2004). Like the Commerce Clause, the Property Clause provides the United States with plenary power, albeit with respect to federal lands. *Id.* at 1308.

The Third Circuit in *NCAA* similarly held that equal sovereignty principles did not apply to a statute enacted pursuant to Congress's Commerce Clause power giving preferential treatment to Nevada alone to authorize sports gambling. The court reasoned that any regulation of interstate commerce necessarily affects states differently and that the regulation of gambling via the Commerce Clause is "not of the same nature as the regulation of elections" under the Fifteenth Amendment. 730 F.3d at 238. So too here with respect to regulation of interstate railroads. *See Ind. R.R. v. Ill.Com. Comm'n*, 576 F. Supp. 3d 571, 577 (N.D. Ill. 2021) (summarily rejecting Illinois' argument that the 3R Act's preemption provision did not survive *Shelby County*). The Court should reject Defendants' Tenth Amendment challenge.[3]

## CONCLUSION

For the foregoing reasons, the Court should reject Defendants' constitutional challenge.

Dated: December 18, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

/s/ Brian Rosen-Shaud
BRIAN C. ROSEN-SHAUD
ME Bar. No. 006018
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 353-7667
Fax: (202) 616-8460
Email: Brian.C.Rosen-Shaud@usdoj.gov

---

[3] The United States acknowledges that the purpose for which the 3R Act, including the preemption provision in Section 797j, was enacted has been satisfied. *See* Study of Repeal of Conrail Provisions, ECF 25-4 at 6-11. But Defendants have not made an argument that Section 797j fails rational basis review. Nor could they because the question would be whether there was a "state of facts at the time the law was enacted," which long predates the authority on which Defendants rely. *See Lindsley v. Nat. Carbonic Gas Co.*, 220 U.S. 61, 78 (1911).

<u>Mailing Address</u>:
Post Office Box 883
Washington, D.C. 20044

<u>Courier Address</u>
1100 L Street NW
Washington, D.C. 20005

*Counsel for the United States of America*

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on December 18, 2023.

*/s/ Brian Rosen-Shaud*
BRIAN C. ROSEN-SHAUD

8